In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1114

WILLIAM A. BOOKS and
MICHAEL SUETKAMP,

Plaintiffs-Appellants,

v.

CITY OF ELKHART, INDIANA,

Defendant-Appellee.


Appeal from the United States District Court
for the Northern District of Indiana, South Bend
Division.
No. 98 C 230--Allen Sharp, Judge.


ARGUED MAY 12, 2000--DECIDED DECEMBER 13, 2000


  Before RIPPLE, MANION and WILLIAMS, Circuit
Judges.

  RIPPLE, Circuit Judge.  On the lawn of
the City of Elkhart's Municipal Building
stands a monument inscribed with the Ten
Commandments. William A. Books and
Michael Suetkamp, residents of Elkhart,
object to the display of this monument on
government property. They brought this
action in the district court, claiming
that the display of the monument by the
City of Elkhart violates the
Establishment Clause of the First
Amendment to the Constitution of the
United States. The district court granted
summary judgment for the City of Elkhart.
For the reasons set forth in the
following opinion, we reverse the
judgment of the district court and remand
for proceedings consistent with this
opinion.

I
BACKGROUND
A.  Facts

  A monument inscribed with the Ten
Commandments is located on the lawn in
front of the Municipal Building of the

City of Elkhart ("the City" or "Elkhart"). The plaintiffs, residents of Elkhart, object to the presence of this monument in this location. We therefore must determine whether this presence of the monument violates the Establishment Clause of the Constitution of the United States, which has been made applicable to the states through the Fourteenth Amendment./1 This task requires that we examine the history of the monument's placement and maintenance as well as the physical characteristics of the monument and of the surrounding area.

1.

In the 1940s, a juvenile court judge in Minnesota, E. J. Ruegemer, inaugurated the Youth Guidance Program. Disheartened by the growing number of youths in trouble, he sought to provide them with a common code of conduct. He believed that the Ten Commandments might provide the necessary guidance. Judge Ruegemer originally planned to post paper copies of the Ten Commandments in juvenile courts, first in Minnesota and then across the country. To help fund his idea, he contacted the Fraternal Order of Eagles ("FOE"), a service organization dedicated to promoting liberty, truth, and justice. At first, FOE rejected Judge Ruegemer's idea because it feared that the program might seem coercive or sectarian. In response to these concerns, representatives of Judaism, Protestantism, and Catholicism developed what the individuals involved believed to be a nonsectarian version of the Ten Commandments because it could not be identified with any one religious group. After reviewing this version, FOE agreed to support Judge Ruegemer's program.

Around this same time, motion picture producer Cecil B. DeMille contacted Judge Ruegemer about the program. DeMille, who was working to produce the movie "The Ten Commandments," suggested that, rather than posting mere paper copies of the Ten Commandments, the program distribute bronze plaques. Judge Ruegemer replied that granite might be a more suitable material because the original Ten Commandments were written on granite. DeMille agreed with Judge Ruegemer's suggestion, and the judge thereafter worked with two Minnesota granite companies to produce granite monuments

inscribed with the Ten Commandments. Local chapters of FOE financed these granite monuments and then, throughout the 1950s, donated them to their local communities. The Elkhart chapter of FOE donated its version of the Ten Commandments monument to the City of Elkhart in 1958.

Elkhart's newspaper, The Elkhart Truth, published an article about the dedication of the Ten Commandments monument to the City of Elkhart. See R.29, Ex.A, Ceremonies Pay Tribute in Memorial Day Rite; City Given Decalogue, The Elkhart Truth, May 31, 1958, at 1. The dedication was a part of the City's Memorial Day ceremonies, and the participants in the dedication included: Robert Long, city controller; Mahlon Hull, past president of the Elkhart Chapter of FOE; Dale Swihart, lodge secretary for FOE; the Reverend William Gieranowski, assistant pastor of St. Vincent's Catholic Church; the Reverend W. W. Kenhell, outgoing president of the Elkhart Ministerial Association; and Rabbi M. E. Finkelstein of Temple Israel.

According to the newspaper, Reverend Kenhell spoke at the ceremony, imparting the message that "Americans have inherited moral power from the founding fathers of our country, . . . and if they will accept the precepts of the Ten Commandments, it will provide their redemption from today's strife and fear." Id. Father Gieranowski also spoke at the ceremony and stated that moral law does not change and that the Ten Commandments should be engraved not only in stone but in the hearts, minds, and consciences of everyone. See id. Finally, the newspaper noted, Rabbi Finkelstein explained that the dedication of the monument "should be an occasion for dedication of everyone to the high ideals inherent in the American way of life." Id.

2.

As we have noted earlier, Elkhart's Ten Commandments monument is located on the lawn in front of the City's Municipal Building. The Municipal Building, situated on the corners of Second and High Streets in downtown Elkhart, contains the mayor's office, the City's legal and human relations departments, the city court, the prosecutor's office,

and the offices of the Common Council. Above the main entrance to the Municipal Building is a bas relief of an elk's head. Directly to the left of the elk's head is the word "DEDICATVM," and on the immediate right of the elk's head is the word "JVSTITIAM."/2 R.29 & 31, Ex.14-16.

The lot for the Municipal Building contains the building itself, sidewalks, and a parking area. Between the building and the sidewalks is a grass lawn that is approximately 25 feet wide. Within this lawn are three monuments. The City maintains this lawn surrounding the monuments but does not contribute any time, money, or effort to the maintenance of the monuments themselves.

On the southeast corner of the building's lot--the corner nearest the intersection--are the Revolutionary War Monument and the Freedom Monument. The Revolutionary War Monument, closest to the street, is a large stone, which bears a plaque and is surrounded by a bed of flowers. See R.29 & 31, Ex.23-24. The plaque explains that the monument was donated by the Daughters of the American Revolution in honor of the Revolutionary War soldiers buried in Elkhart County. Behind the Revolutionary War Monument is the Freedom Monument. The Freedom Monument is a brick pillar with a light on its top. A plaque on the pillar reads: "BEHOLD FRIEND, YOU ARE NOW ON HALLOWED GROUND FOR HERE BURNS FREEDOMS HOLY LIGHT." R.29 & 31, Ex.25. Collectively, the Revolutionary War Monument and the Freedom Monument are referred to as the War Memorial.

On the northeast corner of the lot is the Ten Commandments monument./3 The Ten Commandments monument is made of granite and stands six feet high and three and one-half feet wide. The largest portion of the monument is consumed by the text of the Ten Commandments. The face of the monument reads as follows:

the Ten Commandments

I AM the LORD thy God.

Thou shalt have no other gods before me.

Thou shalt not make to thyself any graven images.

Thou shalt not take the Name of the Lord thy God in vain.

Remember the Sabbath day, to keep it holy.

Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.

Thou shalt not kill.

Thou shalt not commit adultery.

Thou shalt not steal.

Thou shalt not bear false witness against thy neighbor.

Thou shalt not covet thy neighbor's house.

Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's.

R.29 & 31, Ex.5. This text, as stated previously, is an amalgamation of Jewish, Protestant, and Catholic versions of the Ten Commandments.

At the top of the monument, there are two small tablets that contain ancient Hebrew script. Surrounding both of these tablets is a floral design, and between the two tablets is an eye within a pyramid--an all-seeing eye./4 Immediately below the all-seeing eye is an American Eagle grasping the American flag. Below the text on the monument are two small Stars of David. In the center of the two stars is a similarly sized symbol representing Christ: two Greek letters, Chi and Rho, superimposed upon each other. At the base of the monument is a small scroll, which reads as follows:

PRESENTED TO
THE CITY OF ELKHART, IND.
BY
ELKHART AERIE NO. 395
FRATERNAL ORDER OF EAGLES
MAY, 1958

Id.

Photos of the Ten Commandments monument

and of the front of the Municipal Building were included in the trial record and are attached as appendices to this opinion.

3.

Insofar as this record shows, the presence of the Ten Commandments monument on the lawn of the Elkhart Municipal Building produced no controversy until 1998. In that year, the City's mayor was informed that, unless the monument was removed, a lawsuit would be filed. After this warning was received, the Common Council of the City of Elkhart convened on May 4, 1998, and adopted a resolution "regarding the display of the Ten Commandments on public property." R.29, Ex.B. According to this resolution, the monument and the symbols on its face recognize the historical and cultural significance of the Ten Commandments. The Common Council noted in its resolution that numerous other historical and cultural plaques are inside the Municipal Building. The Common Council further emphasized that "the Ten Commandments have had a significant impact on the development of the fundamental legal principles of Western Civilization." Id. Finally, the Common Council concluded that, because the Ten Commandments monument "is a historical and cultural monument that reflects one of the earliest codes of human conduct," it was proper for the monument to remain. Id. Because the Common Council did not remove the monument, two residents of Elkhart filed this action against the City of Elkhart.

4.

Plaintiff William Books is a resident of Elkhart County and has resided in Elkhart since the early 1980s. In Mr. Books' affidavit, he states that "[t]o the extent that I must, or wish to, go to the Municipal Building to participate as a citizen of Elkhart I must come into direct and unwelcome contact with the [Ten Commandments] monument." R.24, Attachment 1, at 2. Mr. Books explains that, in the past, he has gone to the Municipal Building to pay a traffic ticket and to attend City Council meetings when the issues discussed were ones that interested him. Also, notes Mr. Books, his deposition for this case was

conducted in the City Attorney's office in the Municipal Building. As Mr. Books explains, although he could use the Municipal Building's side entrance instead of its main entrance in order to avoid the monument, he "know[s] the Ten Commandments monument is there whether [he] see[s] it or not." Id. at 3.

Mr. Books further explains that he passes the monument in his daily activities, including: riding his bicycle on a route that passes the Municipal Building; patronizing the Elkhart Public Library, which is located across the street from the Municipal Building; and visiting his landlord's office and his cousin's house, both of which are located near the Municipal Building. He states that, in order to avoid seeing the Ten Commandments monument, he "would have to assume the special burden of altering [his] daily routine so as to avoid this direct and unwelcome contact." Id. at 2.

Plaintiff Michael Suetkamp is also a resident of Elkhart County and has lived in Elkhart since the early 1990s. In his affidavit, Mr. Suetkamp states that he is an atheist and is offended deeply by the placement of the Ten Commandments monument on the property of the City of Elkhart. He states that he must come in direct and unwelcome contact with the monument to participate as a citizen of Elkhart. As he explains, he has entered the Municipal Building to pay a traffic ticket, to attend a City Council meeting, to talk to the City Council's Clerk, and to have his deposition taken by the City Attorney in this case.

Mr. Suetkamp also avers that he comes in direct and unwelcome contact with the monument in his daily activities. For example, he states that the route he takes to return home from work passes the Municipal Building and that he sometimes sees the monument when entering the Elkhart Public Library. Although he passes the monument frequently, Mr. Suetkamp admits that he does not look di rectly at it every time, but he states that "[e]ven if I don't see it, I certainly know it is there." R.24, Attachment 4, at 2.

B.  Proceedings in the District Court

The district court held that the

placement of the Ten Commandments monument on the lawn of the Elkhart Municipal Building did not violate the Establishment Clause. When analyzing the placement of the monument under the test set out in Lemon v. Kurtzman, 403 U.S. 602 (1971), the court examined (1) whether the City had a secular purpose in maintaining the monument, (2) whether the primary effect of the monument was to advance religion, and (3) whether the City's action fostered an excessive entanglement of government with religion. See id. at 612-13. After stating that the third prong did not apply, the court found that Elkhart had a secular purpose for the monument. According to the court, the City's purpose in accepting the monument, promoting morality in youths, is a legitimate aim of government and is a traditional part of the police powers of the state. Also, the court stated, the City's purpose in continuing to display the monument, to maintain exhibits of cultural and historical significance on City property, is also secular.

The court also discussed whether the monument had the effect of endorsing religion. It noted that this question is asked from the perspective of a reasonable observer who is charged with knowledge of the history and context of the display. The court stated that a reasonable observer looking at the monument would know that the Ten Commandments has both religious and historical significance and would acknowledge the significance of the religious symbols on the monument as signs of the major religions of this country at the time of the monument's donation. The court next pointed out that a reasonable observer would view the Ten Commandments monument as part of the City's overall collection of displays of historical and cultural significance. As the court explained, the lawn in front of the Municipal Building is small, and the City could not be expected to put all of its displays in one place. The court then held that it does not violate the Establishment Clause for the City of Elkhart to acknowledge the importance of the Ten Commandments in the legal and moral development of the nation by displaying the monument on the lawn of the Municipal Building./5

II
DISCUSSION

A.   Standard of Review

   We review de novo the decision of the district court to grant summary judgment. See Wright v. Illinois Dep't of Corrections, 204 F.3d 727, 729 (7th Cir. 2000). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In determining whether a genuine issue of material fact exists, we must review the record in the light most favorable to the plaintiffs and make all reasonable inferences in their favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Here, the parties do not dispute the material facts, so we shall review de novo the district court's conclusions of law. See Freedom From Religion Found., Inc. v. City of Marshfield, 203 F.3d 487, 490 (7th Cir. 2000).

B.   Standing
1.

   Under Article III of the Constitution of the United States, a plaintiff must have standing to bring an action before a federal court. To have standing, the Supreme Court has explained, the plaintiff must allege (1) that he has suffered an injury in fact (2) that is fairly traceable to the action of the defendant and (3) that will likely be redressed with a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). Here, the dispute centers on the first element: whether the plaintiffs suffered an injury in fact by the City's display of the Ten Commandments on government property.

   To allege adequately an injury in fact, a plaintiff must show "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Id. at 560 (citations and quotation marks omitted). In the context of the Establishment Clause, our cases have required that, to allege properly that a plaintiff has suffered an injury in fact from the display of a religious

object, the individual may show he has undertaken a special burden or has altered his behavior to avoid the offensive object. See, e.g., Freedom From Religion Found., 203 F.3d at 489 (avoids using the park); Gonzales v. North Township, 4 F.3d 1412, 1416-17 (7th Cir. 1993) (avoids area of the park); Harris v. City of Zion, 927 F.2d 1401, 1405 (7th Cir. 1991) (alters travel routes); Doe v. Village of Crestwood, 917 F.2d 1476, 1478 (7th Cir. 1990) (will stay away from festival); American Civil Liberties Union v. City of St. Charles, 794 F.2d 265, 269 (7th Cir. 1986) (alters behavior by detouring); Doe v. Small, 726 F. Supp. 713, 718-19 (N.D. Ill. 1989), rev'd en banc on other grounds, 964 F.2d 611 (7th Cir. 1992) (avoids using park).

The district court here, however, relied on Doe v. County of Montgomery, 41 F.3d 1156 (7th Cir. 1994), to determine whether the plaintiffs had suffered an injury in fact even though they had not altered their behavior to avoid the Ten Commandments monument. In Doe, a permanent metal sign, hanging over the main entrance of the county's courthouse, read: "THE WORLD NEEDS GOD." The plaintiffs were residents of the county and wished to avoid the sign; however, in order to participate as citizens of their county and to fulfill certain legal obligations, they needed to use the courthouse. They alleged that they had to come in direct and unwelcome contact with the sign when using the courthouse. In that case, we held that the plaintiffs' allegations that they must come in direct and unwelcome contact with the religious display to participate fully as citizens of their county and to fulfill their legal obligations were sufficient to show that they had suffered an injury in fact. See id. at 1159. As we stated, "direct and unwelcome exposure to a religious message cannot be distinguished from the 'injuries' of other plaintiffs who have had standing to bring claims under the Establishment Clause." Id. at 1159. We then noted that both the Supreme Court and this court have found standing for constitutional challenges to religious conduct when the plaintiffs did not assume a special burden or alter their behavior. See Lee v. Weisman, 505 U.S. 577 (1992) (student and parent objected to planned invocations and benedictions at non-mandatory graduation ceremonies);

Wallace v. Jaffree, 472 U.S. 38 (1985) (school children and parents objected to one-minute period of silence); Stone v. Graham, 449 U.S. 39 (1980) (per curiam) (students and parents objected to posting of Ten Commandments); School Dist. of Abington Township v. Schempp, 374 U.S. 203, 205, 224 n.9 (1963) (school children and parents objected to reading of Bible in school although students could chose to be absent at time or to not participate); Berger v. Rensselaer Cent. Sch. Corp., 982 F.2d 1160, 1164 n.4 (7th Cir. 1993) (parent of school children objected to distribution of Gideon Bibles in the schools); Sherman v. Community Consol. Sch. Dist. 21 of Wheeling Township, 980 F.2d 437, 441 (7th Cir. 1992) (student objected to recitation of Pledge of Allegiance).

   The district court followed the holding of Doe and noted that the plaintiffs had alleged that they must come in direct and unwelcome contact with the Ten Commandments monument to participate fully as citizens of Elkhart and to fulfill their legal obligations. The court questioned whether the plaintiffs had to look at the monument to enter the Municipal Building, as the plaintiffs in Doe had to see the sign over the main entrance to enter the county courthouse, but found that the facts were sufficiently close to fit within the rule of Doe. Therefore, the plaintiffs had standing to challenge the placement of the monument in front of the Municipal Building.

2.

   The plaintiffs bear the burden of establishing that they have standing to bring this action. See Doe, 41 F.3d at 1159. To meet that burden, plaintiffs Books and Suetkamp both allege that they must come in direct and unwelcome contact with the Ten Commandments monument to participate fully as citizens of Elkhart and to fulfill certain legal duties. Moreover, they each allege specific examples in which they have entered the Municipal Building to participate as a citizen of Elkhart or to fulfill a legal obligation.

   According to the City, the plaintiffs must alter their behavior to avoid the Ten Commandments monument before they can

allege that they have suffered an injury in fact. In Doe, the City submits, the plaintiffs wished to avoid the religious sign above the courthouse's main entrance but could not do so if they wished to use the courthouse and to participate as citizens of the county. Here, the City argues, the plaintiffs could have entered the Municipal Building through alternative entrances, or, even if entering through the main entrance, they could have passed along the back of the Ten Commandments monument. Because of these two options, the City contends, the plaintiffs did not need to come in direct and unwelcome contact with the text on the Ten Commandments monument in order to participate as citizens of Elkhart or to fulfill their legal obligations. Thus, the City asserts, the plaintiffs have not alleged that they suffered an injury in fact by the placement of the Ten Commandments monument on the lawn of the Municipal Building.

3.

As this court discussed in Doe, the Supreme Court has addressed the requirements for standing when a plaintiff must view a religious symbol in his daily routine or when he is forced to come in contact with religious conduct through participation in school or in government. See Doe, 41 F.3d at 1160. As we demonstrated in Doe, our holding in that case is grounded firmly in the precedent of the Supreme Court. Therefore, we must conclude that the plaintiffs have standing to challenge the placement of the Ten Commandments monument on the lawn of the Municipal Building.

We agree with the district court that there is no principled distinction between the facts of Doe and the facts presented here. In Doe, the plaintiffs were required to come in direct and unwelcome contact with the religious display in order to participate fully in government and to fulfill their legal obligations. Here, the plaintiffs must do the same. Although it is true that the plaintiffs here could have altered their path into the Municipal Building to avoid the monument, an act that would have given them standing under Seventh Circuit precedent, see, e.g., Freedom From Religion Found., 203 F.3d at 489; City of

St. Charles, 794 F.2d at 269, they were not obligated to do so to suffer an injury in fact, see Doe, 41 F.3d at 1160-61. Moreover, because the plaintiffs are aware of the words written on the front of the monument, merely walking behind it will not eradicate the injury they allegedly suffered by passing the TenCommandments monument. We therefore conclude that a plaintiff may allege an injury in fact when he is forced to view a religious object that he wishes to avoid but is unable to avoid because of his right or duty to attend the government-owned place where the object is located. See Doe, 41 F.3d at 1159-61. Therefore, the plaintiffs have alleged sufficient facts to demonstrate that they suffered an injury in fact by the placement of the Ten Commandments monument on the lawn of the Municipal Building.

C.  Governing Principles and Application

Although various members of the Supreme Court of the United States have criticized it,/6 the test first enunciated by the Court in Lemon v. Kurtzman, 403 U.S. 602 (1971), remains the prevailing analytical tool for the analysis of Establishment Clause claims. As an intermediate federal appellate court, we are obliged by the doctrines of stare decisis and precedent to employ that methodology unless instructed otherwise by the Supreme Court./7 See, e.g., Freedom From Religion Found., 203 F.3d at 493 (emphasizing Lemon test in Establishment Clause analysis); Bridenbaugh v. O'Bannon, 185 F.3d 796, 797 (7th Cir. 1999) (same); Tanford v. Brand, 104 F.3d 982, 986 (7th Cir. 1997) (same); Kerr v. Farrey, 95 F.3d 472, 476-80 (7th Cir. 1996) (same); Fleischfresser v. Directors of Sch. Dist. 200, 15 F.3d 680, 685-86 (7th Cir. 1994) (same); Sherman, 8 F.3d at 1163-64 (same). Under the approach mandated by Lemon, we must consider: (1) whether the government activity in question has a secular purpose, (2) whether the activity's primary effect advances or inhibits religion, and (3) whether the government activity fosters an excessive entanglement with religion. See Lemon, 403 U.S. at 612-13. Governmental action is violative of the constitutional prohibition against the establishment of religion if it violates any one of these

three prongs. See Edwards v. Aguillard, 482 U.S. 578, 583 (1987). In this case, the plaintiffs do not contend that the display of the monument involves an excessive entanglement with religion; therefore, we shall confine our discussion to the first two prongs of the analysis.

Before turning to the situation before us, we also note that, in more recent cases, the Supreme Court has, on occasion, articulated these first two prongs in terms of an "endorsement" test. See County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U.S. 573, 592 (1989) (formally accepting the endorsement test and stating that "[i]n recent years, we have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion, a concern that has long had a place in our Establishment Clause jurisprudence"); see also Santa Fe Indep. Sch. Dist. v. Doe, 120 S. Ct. 2266, 2278 (2000) (asking whether the state endorsed religion by allowing a student to lead a prayer to open high school football games); Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 763-65 (1995) (acknowledging endorsement test but stating that it did not apply in the case at hand because the correct analysis for private religious speech in a public forum was under the Free Speech Clause). As we noted recently in Freedom From Religion Foundation, "[u]nder this test, 'the effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.'" 203 F.3d at 493 (quoting Lynch v. Donnelly, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring)).

1.

The first part of our inquiry must be to determine whether the display of this tablet by the City of Elkhart has the primary purpose of "advancing or inhibiting religion." Agostini v. Felton, 521 U.S. 203, 222-23 (1997). As the Court has explained, "'The purpose prong of the Lemon test asks whether the government's actual purpose is to endorse or disapprove of religion.'" Aguillard, 482 U.S. at 585 (quoting Lynch, 465 U.S. at

690 (O'Connor, J., concurring)). In determining whether this particular display of the Ten Commandments can be said to have a valid secular purpose, we must evaluate the totality of the circumstances surrounding the placement and maintenance of the monument.

As a starting point, we do not think it can be said that the Ten Commandments, standing by themselves, can be stripped of their religious, indeed sacred, significance and characterized as a moral or ethical document. Indeed, the Supreme Court made this point clear in Stone v. Graham, 449 U.S. 39 (1980), when it noted that a simple reading of the Ten Commandments does not permit us to ignore that they transcend "arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness. Rather, the first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day." Id. at 41-42 (citations omitted). Indeed, when one goes beyond the text itself and regards this particular display, the religious nature of the document is emphasized by the very format of the monument. Notably, the prefatory words "I am the Lord thy God" are set out in large lettering at the top of the text. R.29 & 31, Ex.5. This religious format is enhanced, not detracted from, by the etchings at the bottom of the tablet of the Stars of David and the Chi Rho symbol, a distinctive Christian symbol. It cannot be doubted, therefore, that this monument bearing the Ten Commandments possesses a religious nature.

The display of a religious symbol still may, under certain circumstances, have a secular purpose. The text of the Ten Commandments no doubt has played a role in the secular development of our society and can no doubt be presented by the government as playing such a role in our civic order. For example, on the wall of the Supreme Court there is a frieze that contains Moses holding the Ten Commandments. The frieze contains depictions of two other religious figures, Confucius and Mohammed, but it also includes Caesar Augustus, William Blackstone, Napoleon Bonaparte, and John

Marshall. Justice Stevens has stated that the placement of all of these historic figures together on the frieze signals a respect for great lawgivers, not great proselytizers. See County of Allegheny, 492 U.S. at 652 (Stevens, J., concurring in part and dissenting in part). This is a fitting message, he tells us, for the wall of a courtroom. See id. at 653. A display is unconstitutional, according to Justice Stevens, "only when its message, evaluated in the context in which it is presented, is nonsecular." Id. at 652. Indeed, the Court in Stone emphasized that the challenged statute that required the posting of the Ten Commandments on schoolroom walls did not present "a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." 449 U.S. at 42.

The Supreme Court has stressed the importance of the context of a clearly religious symbol in determining whether the purpose in displaying the symbol is religious or secular. We also have emphasized that religious symbols should not be considered in the abstract; instead, courts must ask "whether the particular display at issue, considered in its overall context, could be said to advance religion." American Jewish Congress v. City of Chicago, 827 F.2d 120, 125 (7th Cir. 1987).

Here, the record discloses no significant attempt by the City of Elkhart to present the text of the Ten Commandments in a way that might diminish its religious character./8 Indeed, the history of the City's involvement in the placement of this particular monument serves to emphasize a religious purpose in its display. As we have noted already, the original impetus behind the proliferation of the Ten Commandments monuments was Judge Ruegemer's desire to provide youths with a common code of conduct that they could use to govern their actions. In accepting the monument, the City also aimed to provide a code of conduct for the citizens of Elkhart to follow. The code chosen, however, was a religious code that focuses not only on subjects that are the legitimate concern of civil authorities, but also subjects that are beyond the ken of any government

and that address directly the relationship of the individual human being and God. That the purpose was to endorse, through governmental sponsorship, a code of religious values is further established by the program of speakers at the dedication of the monument: a Protestant minister, a Catholic priest, and a Jewish rabbi. When these religious leaders spoke, the first speaker urged Americans to accept the precepts of the Ten Commandments because they could provide redemption from strife and fear. The second speaker stated that the Ten Commandments should be engraved not only in stone but in the hearts, minds, and consciences of everyone. Finally, the last speaker recommended that the dedication of the monument should be an occasion for the dedication of everyone to the high ideals inherent in the American way of life. The participation of these influential members of several religious congregations makes it clear that the purpose for displaying the monument was not only to provide youths with a common code of conduct to guide their participation in the civil community but also to urge the people of Elkhart to em brace the specific religious code of conduct taught in the Ten Commandments. Thus, in applying the purpose prong of Lemon, the inherently religious nature of the Ten Commandments is strengthened by the circumstances surrounding the display of the monument. We cannot escape the conclusion that the purpose in displaying this monument was to promote religious ideals.

Moreover, nothing in the subsequent history of the monument can be said to have in any way transformed that religious purpose. The City's resolution, issued on the eve of this litigation and proclaiming a secular purpose for the monument's presence by recognizing the historical and cultural significance of the Ten Commandments, ought to be accorded no more weight than the avowed secular legislative purpose articulated by the Kentucky legislature in Stone. In Stone, the Kentucky statute required the following language at the bottom of each Ten Commandments display: "'The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the

United States.'" 449 U.S. at 41 (quoting 1978 Ky. Acts 436, sec. 1, Ky. Rev. Stat. Ann. sec. 158.178 (1980)). The Supreme Court responded to this statement of purpose by stating that "such an 'avowed' secular purpose is not sufficient to avoid conflict with the First Amendment." Id.; see also Santa Fe Indep. Sch. Dist., 120 S. Ct. at 2278 (reiterating that a governmental entity's professed secular purpose for an arguably religious policy is entitled to some deference but that it is the duty of the courts to ensure that the purpose is sincere); Aguillard, 482 U.S. at 586-87 (stating that courts should normally defer to a state's articulation of a secular purpose, but the statement of such purpose must be sincere). As we noted in Gonzales, 4 F.3d at 1419, although this court "will defer to a municipality's sincere articulation of a religious symbol's secular purpose," we shall not accept a stated purpose that merely seeks to avoid a potential Establishment Clause violation. Similarly, we hold that the City of Elkhart's avowed secular purpose of recognizing the historical and cultural significance of the Ten Commandments, issued on the eve of litigation, "is not sufficient to avoid conflict with the First Amendment." Stone, 449 U.S. at 41. We therefore hold that the purpose of displaying the Ten Commandments monument was not secular. The display of the monument, consequently, violates the first prong of the Lemon test and cannot survive Establishment Clause scrutiny.

2.

Even if we were to ignore the primary purpose behind displaying the Ten Commandments monument, we would have to conclude that this particular display has the primary or principal effect of advancing religion. In County of Allegheny, the Court noted that, under this prong, courts have a special responsibility to ensure that a government-sponsored display does not have the purpose or the effect of endorsing a religion. See 492 U.S. at 592. As we noted recently in Freedom of Religion Foundation, "[u]nder this test, 'the effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.'" 203 F.3d at 493 (quoting

Lynch, 465 U.S. at 690 (O'Connor, J., concurring)). When employing this analytical approach, we are charged with the responsibility of assessing the totality of the circumstances surrounding the display to determine whether a reasonable person would believe that the display amounts to an endorsement of religion. See County of Allegheny, 492 U.S. at 597 (stating that "the government's use of religious symbolism is unconstitutional if it has the effect of endorsing religious beliefs, and the effect of the government's use of religious symbolism depends on its context").

In County of Allegheny, the plaintiffs challenged the recurring holiday displays of a creche placed on the Grand Staircase inside the county courthouse and of a Chanukah menorah placed outside the city-county building. The Court held that the placement of the creche violated the Establishment Clause. The creche in question was surrounded on three sides by a wooden fence. Along the fence sat poinsettias, and on each of the two ends of the fence was a small evergreen tree. A plaque was attached to the fence that announced that the display had been donated by the Holy Name Society. The creche was used as the setting for weekday Christmas caroling by local musical groups. The Court noted that the creche was capable of communicating a religious message, but then explained that "the effect of a creche display turns on its setting" because "the context of the display [could] detract[ ] from the creche's religious message." Id. at 598. In assessing the context surrounding the creche in County of Allegheny, the Court determined that nothing detracted from its religious message. The floral border drew one's attention to the display, and the fact that traditional Christmas flowers were used further contributed to the perception of the endorsement of religion by the government. The sign disclosing ownership by a Catholic organization further enhanced the perception that the government was promoting a religious message. The Court also noted that the creche was displayed on the main and most beautiful part of the building and that the building served as the seat of government. According to the Court, "[n]o viewer could reasonably think that it

occupies this location without the support and approval of the government." Therefore, concluded the Court, "by permitting the 'display of the creche in this particular physical setting,' the county sends an unmistakable message that it supports and promotes the Christian praise to God that is the creche's religious message." Id. at 599-600 (quoting Lynch, 465 U.S. at 692 (O'Connor, J., concurring)). The Court therefore held that the creche display violated the Establishment Clause.

In County of Allegheny, a majority of the Court also held that the menorah placed in front of the city-county building did not violate the Establishment Clause. The menorah was placed next to a 45-foot pine tree that was decorated with lights and ornaments. At the foot of the tree rested a sign that bore the mayor's name and a text that was entitled "Salute to Liberty." The Court held that this particular display was not a violation of the Establishment Clause because its specific setting did not have the primary effect of endorsing religion. Instead, the Court stated that the combination of the now-secularized Christmas tree with a sign extolling liberty and the giant menorah tended to promote the winter-holiday season. The display, held the Court, did not violate the Establishment Clause.

In fulfilling our responsibility to apply faithfully the Establishment Clause jurisprudence of the Supreme Court of the United States, we have subjected to particularly careful scrutiny displays at the seat of government. We have taken this course because "[a]n important concern of the effects test is . . . 'whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices.'" American Jewish Congress, 827 F.2d at 127 (quoting Grand Rapids Sch. Dist. v. Ball, 473 U.S. 373, 390 (1985)). In American Jewish Congress, the City of Chicago had displayed a creche during the holiday season in the lobby of the city-county building. We noted that the seat of government is "a setting where the presence of government

is pervasive and inescapable." Id. at 126. We then held that the display violated the second prong of Lemon "[b]ecause City Hall is so plainly under government ownership and control, every display and activity in the building is implicitly marked with the stamp of government approval." Id. at 128. In that case, the presence of the creche in the lobby of the seat of government created "a clear and strong impression that the local government tacitly endorse[d] Christianity." Id.

We reiterated this principle in Harris v. City of Zion, 927 F.2d 1401 (7th Cir. 1991). In City of Zion, the plaintiffs challenged the seal of two cities because they contained symbols of Christianity, the Latin cross. We stated that the cities' seals containing the Latin cross presented unambiguous endorsements of religion in violation of the Establishment Clause. See id. at 1412. "Depicting these patently religious symbols on a corporate seal that is wholly owned and controlled by the City connotes the City's approval for the message conveyed." Id. at 1414. This endorsement, we held, violated the Establishment Clause. Moreover, we noted, the finding of a constitutional violation was even more compelling in this situation because the seals were "a permanent statement that [was] viewed year-round." Id. at 1412.

In assessing the situation before us, we must ask whether an objective observer familiar with the history and placement of the Ten Commandments monument would perceive it as a state endorsement of religion. See Santa Fe Indep. Sch. Dist., 120 S. Ct. at 2278. We note first that the monument is displayed at the seat of government. As we have just explained, the seat of government "is so plainly under government ownership and control" that every display on its property is marked implicitly with governmental approval. American Jewish Congress, 827 F.2d at 128. Here, in front of the building that houses the governmental departments of the City, stands a religious message. This granite monument is a permanent fixture on the grounds of the seat of government. As viewed by the passer-by or by an individual approaching the building, the monument certainly cannot be fairly characterized as a

component of a comprehensive display of the cultural heritage of the people of Elkhart. Rather, it stands, as the City intended it to be when it dedicated the monument on Memorial Day in 1958, as a sole and stark reminder of the specific injunctions contained in the Commandments. Indeed, the surrounding area enhances the dignity and the primacy of the Commandments. Above the door of the Municipal Building are the Latin words "Dedicatum Justitia." Those who view the Ten Commandments are thus informed that the role of the government in that location is to do justice; the only "law" displayed for doing justice is the monument bearing the Ten Commandments. The only other display on the lawn of the Municipal Building is the War Memorial that reminds the onlooker that the space in front of the Municipal Building is "hallowed ground." R.29 & 31, Ex.25./9 The person approaching the seat of government is thus informed that, at that location, the government goes about the business of doing justice, that the only "law" displayed is the Commandments, and that these Commandments are displayed on land designated by the government as "hallowed ground."

The format of the monument itself hardly dilutes its religious message. Indeed, this monument impermissibly suggests that, in this community, there are "ins" and "outs." The monument contains the Stars of David and the symbol of Christ, representing respectively Judaism and Christianity, two of the religions no doubt particularly represented in the Elkhart community, but by no means the total of all those who depend on the City of Elkhart as their local government. The Supreme Court has cautioned that government "sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents 'that they are outsiders, not full members of the political community, and the accompanying message to adherents that they are insiders, favored members of the political community.'" Santa Fe Indep. Sch. Dist., 120 S. Ct. at 2279 (quoting Lynch, 465 U.S. at 688 (O'Connor, J., concurring)).

In this regard, the placement of the American Eagle gripping the national colors at the top of the monument hardly

detracts from the message of endorsement; rather, it specifically links religion, or more specifically these two religions, and civil government. See City of Zion, 927 F.2d at 1412 (holding that a Latin cross surrounded by other symbols of city life on the city's corporate seal only served to show that the city approved of certain aspects of city life, among them Christianity).

Finally, we cannot say that the monument's acknowledgment of two religious traditions, rather than one, renders the situation before us in compliance with the strictures of the Constitution. "The simultaneous endorsement of Judaism and Christianity is no less constitutionally infirm than the endorsement of Christianity alone." County of Allegheny, 492 U.S. at 615. Although Elkhart's Ten Commandments monument does not endorse Christianity only, it confines its approval to the Judeo-Christian faiths. As the Supreme Court has stated, the First Amendment is "recognized as guaranteeing religious liberty and equality to 'the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism.'" Id. (quoting Wallace, 472 U.S. at 52). Accordingly, we hold that the primary effect of the Ten Commandments monument on the property of the City of Elkhart's Municipal Building is to advance or endorse religion. The display, consequently, fails the second prong of the Lemon test and violates the Establishment Clause.

3.

This case was decided by the district court on cross-motions for summary judgment. Now that we have reversed the district court's grant of summary judgment for the defendants, the district court ought to enter summary judgment for the plaintiffs. The district court must then turn to the question of remedy. In fashioning a remedy, the district court must be guided by the basic rule that the nature of the remedy ought to be determined by the nature and the scope of the constitutional violation. See Milliken v. Bradley, 433 U.S. 267, 280 (1977). It must also proceed in a manner that respects the interests of state and local authorities to manage their own affairs in a manner consistent with the

Constitution of the United States. See id. at 280-81.

In crafting equitable relief to comply with our judgment today, the district court must ensure that, although the condition that offends the Constitution is eliminated, Elkhart retains the authority to make decisions regarding the placement of the monument. In making those decisions, Elkhart has the right and, indeed, the obligation to take into consideration the religious sensibilities of its people and to accommodate that aspect of its citizens' lives in any way that does not offend the strictures of the Establishment Clause. Cf. Zorach v. Clausen, 343 U.S. 306, 313 (1952) ("We are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group."). Arriving at a realistic solution that comports with the strictures of the Establishment Clause will no doubt take some time, and the district court ought to ensure that Elkhart authorities have a reasonable time to address in a responsible and appropriate manner the task of conforming to the letter and spirit of the constitutional mandate.

Conclusion

Cases involving religion pose difficult questions for courts. "Since undoubtedly we are a 'religious people whose institutions presuppose a Supreme Being,' deep feelings are aroused when aspects of that relationship are claimed to violate the injunction of the First Amendment that government may make 'no law respecting an establishment of religion, or prohibiting the free exercise thereof.'" Schempp, 374 U.S. at 230 (Brennan, J., concurring) (citation omitted). This is especially true of cases that require enforcement of the Establishment Clause because that Clause often requires a restriction on religious activity on the part of a government entity and is therefore misperceived as restricting the ability of the community to acknowledge the religious commitment of its people. As our discussion today makes clear, the scope of our Establishment Clause

jurisprudence is far more circumscribed. Rather, the Supreme Court's cases, and the decisions of our court in conformity with those precedents of the High Court, simply prevent government at any level from intruding into the religious life of our people by sponsoring or endorsing a particular perspective on religious matters. It prevents, as Justice O'Connor has pointed out, government from creating among our people "ins" and "outs" on the basis of religion. In this latter respect, it acknowledges the very unique religious nature of our people. Few of us can look too far back in our personal histories--and the Country certainly cannot ignore the circumstance of its own birth--without acknowledging that our ancestors were people who suffered significantly because of their religious belief and who were ostracized by their national communities or made to suffer poverty or even worse because of their religious beliefs. As one visitor to our shores, himself a refugee from Nazi tyranny, put it, Americans can all say, "We are bruised souls." We each carry "the wounds and sorrows of ancestors, and that memory of the sufferings caused by persecution and prejudice which they left to their progeny" is our "spiritual patrimony."/10 The Establishment Clause acknowledges that "spiritual patrimony" and requires that we exercise, in our governmental manifestations of the religious nature of our people, a self-restraint that will prevent anyone from becoming in the eyes of our governmental system--an "out" on the basis of religious beliefs.

   Accordingly, the judgment of the district court is reversed, and the case is remanded for proceedings in conformity with this opinion.

REVERSED and REMANDED


/1 See County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U.S. 573, 588 (1989); Wallace v. Jaffrey, 472 U.S. 38, 48-55 (1985); School Dist. of Abingdon Township v. Schempp, 374 U.S. 203, 215 (1963) (calling the principle "decisively settled"); Cantwell v. Connecticut, 310 U.S. 296, 303 (1940).

/2 The bas relief also contains, in smaller lettering, the words "INCORPO-RATED 1875" on the far left of the elk's head and the words "ERECTED 1915" on the far right of the elk's head. R.29 & 31, Ex.16.

/3 Both the Ten Commandments monument and the War Memorial are approximately the same distance from the main entrance and from the sidewalks. The Ten Commandments monument is 46 feet from the main entrance and 10 feet from the sidewalk, and the War Memorial is 48 feet from the main entrance and 10 feet from the sidewalk. Both are partially shaded by trees.

/4 The all-seeing eye on the monument is similar to the one depicted on the one-dollar bill.

/5 The district court also analyzed the placement of the Ten Commandments under several other "tests." Because we believe that the Lemon test, as refined by Supreme Court precedent, stillcontrols our Establishment Clause jurisprudence, we will not discuss the other tests mentioned by the district court.

/6 See, e.g., Santa Fe Indep. Sch. Dist. v. Doe, 120 S. Ct. 2266, 2284-85 (2000) (Rehnquist, C.J., dissenting) (stating that "Lemon has had a checkered career in the decisional law of this Court" and collecting opinions criticizing Lemon); Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 398-99 (1993) (Scalia, J., concurring in judgment) (comparing Lemon to "some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried" and then collecting opinions criticizing Lemon); County of Allegheny, 492 U.S. at 655-56 (Kennedy, J., concurring in the judgment in part and dissenting in part) (stating that, although he found the Lemon test useful in judging the constitutionality of holiday displays, he did "not wish to be seen as advocating, let alone adopting, that test as our primary guide in this difficult area"); Committee for Pub.

Educ. & Religious Liberty v. Regan, 444 U.S. 646, 671 (1980) (Stevens, J., dissenting) (desiring to avoid "continuing with the sisyphean task of trying to patch together the 'blurred, indistinct, and variable barrier' described in Lemon" (citation omitted)).

/7 See State Oil v. Kahn, 522 U.S. 3, 20 (1997) (stating that the "Court of Appeals was correct in applying [the doctrine of stare decisis] despite disagreement with [a prior Supreme Court opinion], for it is this Court's prerogative alone to overrule one of its precedents"); Agostini v. Felton, 521 U.S. 203, 217 (1997) (reminding appellate courts that "the views of five Justices that [a] case should be reconsidered or overruled cannot be said to have effected a change in Establishment Clause law"); see also DeWalt v. Carter, 224 F.3d 607, 617 n.5 (7th Cir. 2000).

/8 Given the obvious religious nature of the text itself, it falls to the City of Elkhart to demonstrate that it has taken steps to "obviate its religious purpose." Gonzales v. North Township, 4 F.3d 1412, 1421 (7th Cir. 1993); see also Bridenbaugh v. O'Bannon, 185 F.3d 796, 798 (7th Cir. 1999); Metzl v. Leininger, 57 F.3d 618, 621 (7th Cir. 1995).

/9 As stated above, the Freedom Monument reads: "BEHOLD FRIEND, YOU ARE NOW ON HALLOWED GROUND FOR HERE BURNS FREEDOMS HOLY LIGHT." R.29 & 31, Ex.25.

/10 Jacques Maritain, Reflections on America 83-84 (1958).

APPENDIX

MANION, Circuit Judge, concurring in part and dissenting in part. The court sets out an accurate presentation of the facts at issue in this case. Suffice it to say that in a Memorial Day ceremony in 1958 the Fraternal Order of the

Eagles presented to the City of Elkhart a stone monument engraved with a version of the Ten Commandments. The City placed it near the north entrance of the City Hall building where it has remained to this day. The plaintiffs claim that the location of the monument is offensive to them and an unconstitutional endorsement of religion by the City.

I agree with the court's analysis regarding the plaintiffs' standing to challenge the constitutionality of the placement of the Ten Commandments monument. And while I also agree with the court's legal summary of the Lemon test, I disagree with its application of Lemon to the facts before us. Rather, applying Lemon and its progeny should lead to the conclusion that the City of Elkhart does not violate the Establishment Clause by leaving undisturbed a monument inscribed with the Ten Commandments that was erected more than forty years ago. Moreover, even if the monument did not satisfy the Lemon test, the Supreme Court has upheld certain religious practices which have become a part of the fabric of our society. Leaving the Ten Commandments monument where it now stands comfortably falls within the historical context of this country and is thus constitutional even though it retains the unequivocal references to God. I therefore CONCUR in part and DISSENT in part.


I.
A.
Lemon Test

In Lemon v. Kurtzman, 403 U.S. 602 (1971), the Supreme Court adopted a three-part test for analyzing Establishment Clause cases. First, the government's challenged practice must have a secular purpose. Second, the principal or primary effect must be one that neither advances nor inhibits religion. Third, the government's practice must not create an excessive entanglement of religion. As noted by the court, the third prong is not at issue. Accordingly, we focus on the first two prongs of the Lemon test.


1. Secular purpose.

Under Lemon, the government's challenged practice must have a secular purpose. Thus, in this case, we must ask whether a secular purpose supports the City of Elkhart's decision not to remove the Ten Commandments monument. Elkhart presented as evidence of its secular purpose the resolution which its Common Council adopted on May 4, 1998, following consideration of the plaintiffs' request that the City remove the 40-

year-old monument./1

The Council's resolution, which the Mayor of Elkhart approved on May 13, 1998, identifies several secular purposes justifying the City's decision not to remove the Ten Commandments monument. First, as the City recognized, the Ten Commandments represents one of the earliest codes of human conduct and, as such, it "had a significant impact on the development of the fundamental legal principles of Western Civilization." In fact, the Ten Commandments served as a foundation for the formation of both English Common Law and the Napoleonic Code, which together laid the foundation for American jurisprudence. See State of Colorado v. Freedom From Religion Foundation, Inc., 898 P.2d 1013, 1018 (Col. 1995). See also, id. at 1026 (Ten Commandments "monument represents the secular objective intended at the outset, recognition of a historical, jurisprudential cornerstone of American legal significance").

The Common Council's resolution also noted that "the Monument contains symbols that reflect the cross cultural and historical significance of the Ten Commandments," and that the monument serves as a recognition of those roots and the historical significance of the Ten Commandments. These stated justifications are permissible secular purposes even though a religious symbol is used to accomplish them. Anderson v. Salt Lake City Corp., 475 F.2d 29, 34 (10th Cir. 1973) (Ten Commandments monument stands as "a depiction of a historically important monument with both secular and sectarian effects"). See, e.g., Lynch v. Donnelly, 465 U.S. 668, 691 (1984) (O'Connor, J., concurring) ("[c]elebration of public holidays, which have cultural significance even if they also have religious aspects, is a legitimate secular purpose"); id. at 680 ("The creche in the display depicts the historical origins of the traditional event long recognized as a National Holiday. . . . [T]he display is sponsored by the City to celebrate the Holiday and to depict the origins of that Holiday."); American Jewish Congress v. City of Chicago, 827 F.2d 120, 126-27 (7th Cir. 1987) (recognizing that a city's tradition in "taking official note of Christmas" and acknowledging public sentiment in favor of the nativity scene are permissible secular purposes justifying creche display). The fact that the Ten Commandments refers to God, and that all of the world's major monotheistic religions have the Ten Commandments as basic tenets of their faith, does not alter the monument's secular purposes. See, e.g., American Jewish Congress, 827 F.2d at 126 (to serve a secular purpose, the government's purpose need

not be unrelated to religion). Cf. Bridenbaugh v. O'Bannon, 185 F.3d 796, 799-800 (7th Cir. 1999) (the fact that a secular holiday coincides with a day that has religious significance for Christians does not defeat the secular purpose justifying the state holiday).

The court acknowledges the validity of Elkhart's asserted secular purposes, stating "[t]he text of the Ten Commandments no doubt has played a role in the secular development of our society and can no doubt be presented by the government as playing such a role in our civic order." Opinion at 19. And in this case, Elkhart has explicitly stated in its resolution that it was leaving standing the Ten Commandments monument in order to recognize their "significant impact on the development of the fundamental legal principles of Western Civilization." Yet the court concludes that "the purpose in displaying the Ten Commandments monument was not secular." Opinion at 22. How can the court on one hand recognize the legitimacy of this purpose and on the other conclude that Elkhart lacks a legitimate secular purpose for leaving the Ten Commandments monument in place? Apparently, the court just doesn't believe that the City of Elkhart's statement of secular purposes is sincere and not a sham. Edwards v. Aguillard, 482 U.S. 578, 586-87 (1987) ("While the Court is normally deferential to a State's articulation of a secular purpose, it is required that the statement of such purpose be sincere and not a sham.").

But there is no evidence that the Common Council's resolution was a sham, and absent some evidence that the Common Council's stated reasons for its decision not to remove the monument are insincere, we should defer to those asserted justifications. Cohen v. City of Des Plaines, 8 F.3d 484, 489 (7th Cir. 1993). See also American Jewish Congress, 827 F.2d at 127 ("In the absence of any evidence that the city's stated purposes behind the display of the nativity scene are merely a sham, we must conclude that the 1985-86 display had no invidious purpose.") (internal citation omitted). "This is in keeping with the well settled maxim that courts are 'reluctan[t] to attribute unconstitutional motives to the States, particularly when a plausible secular purpose for the State's program may be discerned from the face of the statute.'" Cohen, 8 F.3d at 489-90 (quoting Mueller v. Allen, 463 U.S. 388, 394-95 (1983)). "This is true whether the governing body is a state legislature or a city council." Cohen, 8 F.3d at 489. Accordingly, rather than assume the Common Council is insincere about its motivations, we are obligated to do just the opposite--assume they are being truthful.

The court seemingly relies on the timing of the resolution (noting that it was passed on the eve of litigation) as evidence that the resolution was insincere. But the timing is totally reasonable. Before the plaintiffs objected to the monument and threatened to sue the City, it had rested unobtrusively on the lawn along with other monuments for nearly forty years, so there was never a need for the Common Council to declare its reasons for allowing the monument to remain. It was not until the plaintiffs demanded that Elkhart remove the monument that it became an issue. At that point the currently governing Common Council convened to consider the plaintiffs' demands and decided against removing the monument, stating its reasons in the resolution. Given these circumstances, there is nothing suspect about the timing. In fact, in other Establishment Clause cases, this court has relied on the secular purposes proffered during litigation, notwithstanding the timing of the state's explanation. See Bridenbaugh, 185 F.3d at 799 (relying on testimony offered during litigation as to Indiana's purpose for giving employees a Good Friday holiday); American Jewish Congress, 827 F.2d at 127 (relying on affidavit of chief of staff as to the purpose behind creche display and noting that in the absence of any evidence that the city's stated purpose behind the display was a sham, the court would have to conclude there was no invidious purpose). In those cases we held that, absent any evidence that the stated justification was a sham, we would take the government at its word. Since there is no evidence of an invidious motive here, we should take the Common Council at its word, as set forth in the resolution.

Moreover, even if the City had a religious purpose in displaying the Ten Commandments, that would not destroy the City's other valid secular purposes. "A law that promotes religion may nevertheless be upheld . . . because of the secular purposes that the law also serves. . . ." Metzl v. Leininger, 57 F.3d 618, 620 (7th Cir. 1995). Accordingly, Elkhart need have only one secular purpose justifying its decision in order to satisfy Lemon's first prong. It has presented several secular justifications. Therefore, even if Elkhart, in part, wanted to promote the religious aspects of the Ten Commandments, that does not negate its other valid secular justifications for leaving the monument alone. Bridenbaugh, 185 F.3d at 800 ("[A] secular purpose need not be the exclusive one; it was sufficient if the government had 'a secular purpose.'") (emphasis added). See also, Barghout v. Bureau of Kosher Meat & Food Control, 66 F.3d 1337, 1345 (4th Cir. 1995) ("In determining

whether the [display] has a secular purpose, we note that this first prong of the Lemon test is a fairly low hurdle. A legislative enactment has no secular purpose only if 'there [is] no question that the [display] or activity was motivated wholly by religious consideration.'") (quoting Lynch, 465 U.S. at 680).

The court highlights the speeches made when the monument was dedicated in 1958 as proof of Elkhart's religious purpose in displaying the Ten Commandments. While the speeches made by the various religious leaders were solemn--in line with the occasion--they did not evidence a religious purpose. In fact, those speeches lacked anything near the religious fervor of the legislative statements made in connection with other practices adopted in the 1950's and upheld by the various circuits notwithstanding the sponsors' overtly religious messages. See infra at 59-62. Recall that the Elkhart monument was unveiled on Memorial Day as part of the City's festivities. Participation in that celebration by religious leaders with speeches that had a religious tone is both understandable and acceptable. As recently as 1998, Congress recognized that Memorial Day is a day "during which the people may unite in prayer for permanent peace," and that the President should call "on the people of the United States to observe Memorial Day by praying, according to their individual religious faith, for permanent peace." 36 U.S.C. sec. 116 (1998). Furthermore, even if the various religious leaders' speeches demonstrated that they gladly accepted Elkhart's decision to display the monument because of the monument's religious message, the religious leaders were not the City, and it is only the City's intent that matters.

The speeches, in short, provide little guidance as to Elkhart's original purpose in accepting the monument donated by the Fraternal Order of Eagles. To the extent that the original purpose would matter, see infra at 43, the evidence presented at the summary judgment stage indicates that the City accepted the Ten Commandments monument from the Eagles (a civic, non-religious organization) in order to further the Eagles' goal of providing "youths with a common code of conduct that they could use to govern their actions," and "showing these youngsters that there were such recognized codes of behavior to guide them." Providing youth with a common code ofconduct is a valid secular purpose. See Freedom From Religion Foundation, 898 P.2d at 1023 ("The monument was donated as part of the National Youth Guidance Program, whose purpose was secular in nature. Such secular intent of the donation is logical in light of the historical fact that the

Ten Commandments have served over time as a basis for our national law.").

The court claims that this purpose was not secular because the City chose a religious code to further its goal. But as the Supreme Court recognized in Lynch, a religious symbol can be used to further the secular goal of celebrating both a religious and secular holiday, such as Christmas. Likewise, Elkhart can permissibly choose the Ten Commandments, which includes both religious and secular rules of conduct, to further its secular goal of providing youth with an example of a code of conduct. In fact, it is only logical that when Elkhart chose an example of a "common code of conduct" to display, it chose one that would be recognized by its citizens, and especially children, and there can be no doubt that the Ten Commandments is the most well-known and recognizable code of conduct to Americans, as opposed to, say, the Napoleonic Code or the Code of Hammurabi./2

In any event, the Ten Commandments monument was donated to Elkhart over forty years ago. What matters, however, is not the City's purpose in 1958--when Elkhart could constitutionally have a religious purpose--but the City's purpose today. Bridenbaugh, 185 F.3d at 799 (original reason for choosing Good Friday as state holiday is not dispositive); Metzl v. Leininger, 57 F.3d 618, 621 (7th Cir. 1995) (state's religious purpose 53 years ago may accrue a secular justification and essentially eliminate any purpose of promoting religion); American Jewish Congress, 827 F.2d at 126 (Mayor's comment in 1959 that "We are a Christian Nation," and that "the more religion we can get in politics, the better off we are," while relevant to the original purpose of nativity scene reveals little about purpose behind the 1985-86 display). In its resolution, Elkhart explained its current reasons for leaving undisturbed the Ten Commandments monument: to recognize the historical and cross-cultural significance of the Ten Commandments; to acknowledge the significant impact the Ten Commandments had on the development of the fundamental legal principles of Western civilization; and to retain an historical and cultural monument that displays one of the earliest codes of human conduct. Those reasons are permissible secular justifications, see supra at 37-39, and therefore Elkhart has satisfied Lemon's first prong.

2. Principal or primary effect.

The second prong of Lemon considers whether the government's practice has the principal or primary effect of advancing or inhibiting

religion. Freedom of Religion Foundation v. City of Marshfield, 203 F.3d 487, 493 (7th Cir. 2000). Under this prong, the question is "irrespective of government's actual purpose, [does] the practice under review in fact convey [ ] a message of endorsement or disapproval." Id. (internal quotations omitted). As the court recognizes, to analyze this prong we must assess the totality of the circumstances surrounding the display to determine whether a reasonable person would believe that the display amounts to an endorsement of religion. This is a fact-specific inquiry.

The court's conclusion that, based on all of the circumstances, Elkhart's decision to leave standing the Ten Commandments monument constitutes an endorsement of religion seems to be at odds with the Supreme Court's decisions in Lynch and Allegheny. In Lynch v. Donnelly, 465 U.S. 668 (1984), the Supreme Court considered the constitutionality of the city of Pawtucket, Rhode Island's display of a creche at Christmas. In applying the second prong of the Lemon test, the Court initially noted that the district court had "plainly erred by focusing almost exclusively on the creche." Lynch, 465 U.S. at 686. Rather, according to the Court, the appropriate question was whether the nativity scene, while religious, could be said to advance religion. The Court held that given the overwhelmingly secular character of the Pawtucket display, "the inclusion of a single symbol of a particular historic religious event . . . [did not] so 'taint' the city's exhibit as to render it violative of the Establishment Clause." Id. The display in Lynch included not just the creche, but also a Santa Clause house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing clowns, an elephant and a teddy bear, hundreds of colored lights and a banner reading "Season's Greetings." Id. at 671.

Five years later in County of Allegheny v. American Civil Liberties Union, 492 U.S. 573 (1989), the Supreme Court again considered the constitutionality of religious displays located on public property. One was a creche placed on the Grand Staircase inside a county courthouse in downtown Pittsburgh. The creche was surrounded on three sides by a wooden fence, decorated with poinsettias and a sign proclaiming "Glory to God in the Highest!" The other was a menorah displayed in front of the courthouse. The menorah stood next to a Christmas tree and a sign rested below the tree with the words "Salute to Liberty."

The Court in Allegheny held that the creche

display violated the Establishment Clause because "nothing in the content of the display detracts from the creche's religious message," as it "stands alone; it is the single element of the display on the Grand Staircase," which was "the 'main' and 'most beautiful part' of the building." Id. at 598-99. The Court concluded that based on this location, "no viewer could reasonably think that it occupies this location without the support and approval of the government." Id. at 599-600. On the other hand, the Supreme Court held that the menorah display was constitutional. As Justice Blackmun explained, the menorah stood next to a Christmas tree and a sign saluting liberty, and thus created an "overall holiday setting" which neutralized the religious dimensions of the menorah. Id. at 614 (Blackman, J., concurring).

Together Lynch and Allegheny provide significant guidance for our fact-specific analysis of the second prong of Lemon. In those cases, the Supreme Court upheld the constitutionality of government displays of purely religious symbols-- a creche and a menorah--when those symbols were part of a larger display. But where the religious display--the creche in Allegheny--stood alone, it violated the Establishment Clause. Here, the Ten Commandments monument stands not alone, but as part of Elkhart's larger cultural and historical outdoor display. As the court points out, in addition to the Ten Commandments monument, the small, twenty-five-foot-wide courtyard includes a bas-relief of an elk's head with the words "DEDICATVM" and "JVSTITIAM" inscribed next to this symbol of "Elk"hart; a Revolutionary War Monument surrounded by a flower bed and bearing a plaque explaining that the Daughters of the American Revolution donated the monument in honor of the Revolutionary War soldiers buried in Elkhart County; and the Freedom Monument, which consists of a light standing on top of a brick pillar which reads "BEHOLD FRIEND, YOU ARE NOW ON HALLOWED GROUND FOR HERE BURNS FREEDOM'S HOLY LIGHT."/3

These other displays place the Ten Commandments monument in an historical context, and under Lynch and Allegheny context is everything. Thus, in Lynch, the Court held that a solely religious symbol--a creche--was constitutionally permissible because "[w]hen viewed in the proper context," the creche "depicts the historical origins of the traditional event long recognized as a National Holiday." Lynch, 465 U.S. at 680. Similarly, when viewed in the context of the other monuments displayed outside Elkhart's municipal building, the Ten Commandments monument "depicts the historical origins" of the United States' justice system. Moreover, while the

creche is solely a religious symbol, the text of the Ten Commandments itself provides context to the monument, as the monument includes not just religious commands, but six rules of conduct that have meaning in the secular world. The presence of both secular and religious messages in the Ten Commandments monument makes this a stronger case than the creche at issue in Lynch.

True, there were many more holiday displays present in Lynch than are located in the 25-foot-wide courtyard at issue here, but Elkhart's display still includes more than the total of three involved in Allegheny. In Allegheny, in addition to the menorah, there stood only a Christmas tree and a sign stating "Salute to Liberty." Compared to Allegheny's constitutional "salute to liberty" display, Elkhart's cultural and historical display more fully neutralizes the religious dimension of the Ten Commandments. In short, if the menorah was constitutional in Allegheny, the Ten Commandments display must be in this case. See, e.g., Freedom From Religion Foundation, 898 P.2d 1013 (holding that Ten Commandments monument on Colorado State Capitol Complex was constitutional); Anderson, 475 F.2d at 33 (upholding Ten Commandments monument displayed on the lawn of a courthouse because it had "substantial secular attributes");/4 Suhre, 55 F.Supp.2d 384 (holding display of Ten Commandments in county courtroom did not violate the Establishment Clause).

In its discussion of Lynch and Allegheny, the court does not distinguish these Supreme Court opinions when it concludes that the Ten Commandments monument constitutes an establishment of religion. Rather, the court focuses on the question of whether "an objective observer familiar with the history and placement of the Ten Commandments monument would perceive it as a state endorsement of religion." Opinion at 26. This is the appropriate question, but for the answer we must consider comparable facts underlying the Supreme Court's cases involving the Establishment Clause. That precedent leads to the conclusion that a monument of the Ten Commandments is constitutional when part of a larger historical and cultural display. That is what we have in this case./5

This circuit's decisions in American Jewish Congress, 827 F.2d 120, and Harris v. City of Zion, 927 F.2d 1401 (7th Cir. 1991), do not alter the analysis. Harris applied Lemon to a challenge to a religious symbol contained in two different city seals. It is not helpful because it involved two consolidated cases challenging the official seals of two cities in Illinois. Here the

government's display of a monument which served as only one aspect of a larger historical display has minimal similarity to an official seal emblazoned on stationery, signs, and numerous other official standards. American Jewish Congress is more closely related as it involved the constitutionality of a government-displayed creche. But even the facts in American Jewish Congress differ significantly from those involved in this case. In American Jewish Congress, the creche display, which this court held violated the Establishment Clause, stood in isolation in the center of the City-County building in Chicago. It was the creche's visual isolation from the other holiday displays and its place of honor that caused this court to hold that a reasonable observer of the creche would believe that Chicago was endorsing Christianity. See American Jewish Congress, 827 F.2d 128.

Conversely, in this case, the Ten Commandments monument sits with other monuments on the lawn of the Municipal Building, as opposed to being prominently displayed alone in the center of day-to-day county business. The Ten Commandments monument is also not visually isolated, but rests on one side of the walkway, while two other monuments--the Freedom Monument and the Revolutionary War monument--decorate the opposite side. These monuments are equally distant from both the entrance to the Municipal Building and the sidewalk. Opinion at 5 n.3. And a fourth monument of sorts--the Elk bas-relief-- adorns the visual center of the walkway, hanging over the building's entranceway. Thus, compared to the creche at issue in American Jewish Congress, the Ten Commandments monument is not given special placement by the City. Rather, the Ten Commandments monument is one of multiple monuments closely placed in the available, yet small, walkway leading into the municipal building./6

The court also opines that "The format of the monument itself hardly dilutes its religious message. Indeed, this monument impermissibly suggests that, in this community, there are 'ins' and 'outs.'" Opinion at 27. This reasoning is misplaced for two reasons. First, the inclusion of Jewish, Catholic, and Protestant symbols actually makes the monument more likely to pass constitutional muster. See Freedom From Religion Foundation, 898 P.2d at 1024 ("The juxtaposition of the Christian Chi and Rho with the Jewish Star of David reflect an acknowledgment of reconciliation and diversity more than any sentiment of intolerance . . . [and] the 'eternal eye' contains the pyramid, which is a symbol from Egypt itself, indicating that 'it has a different genesis than the three religions that use the Ten

Commandments.'"). See also, Allegheny, 492 U.S. at 620 (Blackman, J., concurring) ("The Christmas tree alone in the Pittsburgh location does not endorse Christian belief; and on the facts before us, the addition of the menorah 'cannot fairly be understood to' result in the simultaneous endorsement of Christian and Jewish faiths."); id. 492 U.S. at 635 (O'Connor, J., concurring) (the display of a menorah and a secular symbol of the Christmas holiday "did not endorse Judaism or religion in general, but rather conveyed a message of pluralism and freedom of belief. . . ."). Second, implicit in the court's reasoning is the belief that a display must include everyone's religious symbol to avoid constitutional infirmity. We know from Allegheny and Lynch that such is not the case; in Lynch, there was only one religious symbol--that of Christians, a creche--and in Allegheny there was only one religious symbol--that of Jews, a menorah. Yet, the Supreme Court upheld those religious displays because any perceived endorsement of religion was diluted by the secular symbols also displayed-- not because a religious symbol representing every citizen's beliefs was incorporated in the display. Clearly if any display had to include all potential "ins," all displays would be "out."

The court also believes that the placement of an American Eagle gripping the flag at the top of the monument furthers the impression that Elkhart is endorsing religion. Opinion at 27. On the contrary, like the "Salute to Liberty" sign placed by the menorah and Christmas tree in Allegheny, here the presence of the American Eagle, our flag and the All-Seeing Eye help place the monument in context for the viewers by reminding passers-by that the Ten Commandments served an important role in our country's legal foundation. See, e.g., Allegheny, 492 U.S. at 619 ("The [Salute to Liberty] sign further diminishes the possibility that the tree and the menorah will be interpreted as a dual endorsement of Christianity and Judaism. The sign states that during the holiday season the city salutes liberty."). Coupled with the six clearly secular commands, the flag, eagle and all-seeing eye broadcast a secular message of justice and patriotism, as does the inscription that the monument was presented to the City by the Fraternal Order of Eagles--a secular organization dedicated to promoting "Liberty, Truth, Justice, and Equality." But in any event, even to the extent that the placement of American symbols on the Ten Commandments monument does not dilute the religious message contained in the first six commands,/7 it is important to note that the religious aspect of the Ten Commandments need not be minimized; rather it is a message of possible endorsement that must be sufficiently minimized

by its setting and context. See Lynch, 465 U.S. at 692 (O'Connor, J., concurring) ("[A] typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content."). Thus, the overall context of a display must overcome any message of endorsement, and in this case when the Ten Commandments monument is viewed in its park-like setting with the other three artists' secular renderings, any possible view of religious endorsement is sufficiently diluted to withstand constitutional scrutiny.

One final point: It is important to note that while the two plaintiffs involved in this case took offense to the Ten Commandments monument, that is not dispositive because the question is whether an "objective" observer would believe that the display constituted an endorsement of religion. Santa Fe Indep. Sch. Dist. v. Doe, 120 S.Ct. 2260, 2278 (2000). The fact that the plaintiffs--and for that matter many citizens--wrongly believe that the Constitution requires a separation of Church and State, or ardently wish that were the case, does not alter the test. Lynch, 465 U.S. at 673 ("Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any."). Rather, the appropriate question is whether a citizen knowing the totality of the facts and the circumstances would believe that Elkhart seeks to endorse religion. See Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring) ("[T]he reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious display appears."). See also, Gaylor v. United States, 74 F.3d 214, 217 (10th Cir. 1996) (same). An informed citizen would know that the Ten Commandments monument was donated in the 1950's-- and also know the historical context of those times: that the Eagles who donated the monument were not a religious group; that the original purpose was to recognize general codes of conduct and that the Ten Commandments is an historical example of such a code; and that today Elkhart leaves standing the monument out of recognition for that history and in commemoration of the legal roots of our country./8

As the plaintiffs' own testimony demonstrates, they are not reasonably informed citizens, but are demonstrating an outright hostility to religion, even in private, non-governmental settings. See, Books Deposition (stating that he is offended by any reference by a private

organization to God); Suetkamp Deposition (stating that he is offended when the Pledge of Allegiance is said in a private setting). See, e.g., Suhre, 55 F.Supp.2d at 398 ("In fact, the Plaintiff's angst results more from his own intolerance of the rights of others than a desire to protect his own atheistic convictions."); Gaylor, 74 F.3d at 217 (the reasonable observer inquiry is "not about the perceptions of particular individuals or saving isolated non-adherents from the discomfort of viewing symbols of faith to which they do not subscribe") (internal quotation omitted). Based on these facts, a reasonable person would not believe that Elkhart is endorsing religion (which perhaps explains why, other than these two plaintiffs, no one complained to Elkhart about the Ten Commandments monument during the forty years it stood outside the Municipal Building). For these reasons, I conclude that the City's decision to leave standing the monument satisfies Lemon's second prong.

B. Stone v. Graham

The court also relies on Stone v. Graham, 449 U.S. 39 (1980) (per curiam), to support its conclusion that Elkhart's decision to leave standing the Ten Commandments monument constitutes an unconstitutional establishment of religion. In Stone, the Supreme Court (without argument and in a 5-4 per curiam decision) held that a Kentucky statute which required the posting of the Ten Commandments on schoolroom walls was unconstitutional. In concluding that Elkhart had an impermissible religious purpose when it decided to leave in place the Ten Commandments monument, the court relies on the Supreme Court's statement in Stone that the Ten Commandments transcends "arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness. Rather, the first part of the Commandments concerns the religious duties of believers: worshiping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day." Id. at 41-42. Without doubt that is true. But, as the court also recognizes, the display of a religious symbol may still have a secular purpose. Opinion at 19. This point is extremely important when one remembers that Stone was decided prior to Lynch and Allegheny--cases in which displays of purely religious symbols (as opposed to the Ten Commandments which contains both religious and secular rules) were upheld because of other secular justifications. This is significant because in Stone the Ten Commandments were posted alone on school walls, while in this case the Ten Commandments monument is part of a larger

historic display with a secular message. In fact, the Supreme Court in rejecting the posting of the Ten Commandments noted that they were to be displayed in isolation, as opposed to incorporated into "the study of history, civilization, ethics, comparative religion, or the like." Stone, 449 U.S. at 42. That factor distinguishes Stone from the Ten Commandments monument involved in this case, and makes this case more analogous to Lynch and Allegheny.

Stone is distinguishable for another and more fundamental reason--it involved the mandated posting of Ten Commandments in schools. Where impressionable youths are involved the Supreme Court has taken a harsher view of religion. See, e.g., Lee v. Weisman, 505 U.S. 577, 592 (1992) ("[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in schools."); Edwards v. Aguillard, 482 U.S. 578, 583-84 (1987) ("The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools."); Abington v. Schempp, 374 U.S. 203, 307 (1963) (Goldberg, J., concurring) ("The pervasive religiosity and direct governmental involvement inhering in the prescription of prayer and Bible reading in the public schools, during and as part of the curricular day, involving young impressionable children whose school attendance is statutorily compelled, and utilizing the prestige, power, and influence of school administration, staff, and authority, cannot realistically be termed simply accommodation, and must fall within the interdiction of the First Amendment."); Board of Ed. of Westside Community Schools v. Mergens, 496 U.S. 226, 261-62 (Kennedy, J., concurring) ("The inquiry with respect to coercion must be whether the government imposes pressure upon a student to participate in a religious activity. This inquiry, of course, must be undertaken with sensitivity to the special circumstances that exist in a secondary school where the line between voluntary and coerced participation may be difficult to draw."). Thus, while the Supreme Court has upheld the opening of legislative sessions with prayer, Marsh v. Chambers, 463 U.S. 783, 786 (1983), it has declared unconstitutional the opening of school sessions with prayer. Engel v. Vitale, 370 U.S. 421 (1962). Likewise, whereas the Supreme Court upheld the constitutionality of the creche and menorah displays in Lynch and Allegheny, the Court also noted that it would have a different case if the displays arose in the school setting. See, e.g., Allegheny, 492 U.S. at 620 n.69 ("This is not to say that the combined display of a Christmas tree and a menorah is constitutional wherever it may be located on government property. For example, when

located in a public school, such a display might raise additional constitutional considerations. Cf. Edwards v. Aguillard, 482 U.S. at 583-584, 107 S.Ct., at 2577 (Establishment Clause must be applied with special sensitivity in the public-school context)."). Again, context is critical, and the school context in Stone dictated the result, as demonstrated by the Court's reliance on school prayer cases. See Stone, 449 U.S. at 42, citing Abington School District, 374 U.S. 203, and Engel, 370 U.S. 421. Therefore, while Stone speaks for the school setting--where student attendance is compulsory, and pupils are particularly susceptible to influence--it does not answer the question in the context of an open courtyard where citizens may divert their eyes, if confronted by a discomforting reference to God, to one of the other secular monuments forming the larger historical display. See, e.g., Freedom From Religion Foundation, 898 P.2d at 1022-23 (distinguishing Stone based on the school setting, and upholding the constitutionality of a Ten Commandments monument on state capital grounds).

## C. Historical Practices

Given the factual similarities to the displays constitutionally permitted in Lynch and Allegheny, Elkhart's decision to leave the Ten Commandments monument standing should not violate the Lemon test. But even if the Lemon test was not met, where a religious symbol has meaning in history and ubiquity, the Supreme Court has side-stepped the strictures of Lemon because the results would be contrary to the clear intent of the Framers of the Constitution. For instance, in Marsh v. Chambers, 463 U.S. 783 (1983), the Court upheld the practice of Congress opening the legislative session with prayer stating:

In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country.

Id. at 792.

Significantly, Marsh did not apply Lemon, but in its holding recognized the fact that "[t]here is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789."

Lynch, 465 U.S. at 674. In fact, that history predates our three branches of government, beginning with the proclamation in our Declaration of Independence that all men "are endowed by their Creator with certain unalienable Rights," and continues even as recently as the President's call to Americans to "thank God today for the lives, the character, and courage of the crew of the USS Cole."

The Supreme Court has long recognized the constitutionality of such religious references. For instance, the Court has acknowledged that its own court proceedings open with an announcement which concludes "God save the United States and this Honorable Court." Marsh, 463 U.S. at 786. The Court has also noted that the Establishment Clause does not prohibit "[p]rayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a national holiday; 'so help me God' in our courtroom oaths--these and all other references to the Almighty that run through our laws, [and] our public rituals . . . [including] the supplication with which the Court opens each session: 'God save the United States and this Honorable Court.'" Zorach v. Clauson, 343 U.S. 306, 312-13 (1952). Likewise in Lynch v. Donnelly, 465 U.S. at 674-75, Justice O'Connor noted that "[o]ur history is replete with official references to the value and invocation of Divine guidance," and includes "government practices embracing religion, including Thanksgiving and Christmas holidays, congressional and military chaplains and the congressional prayer room, the motto, the Pledge of Allegiance, and presidential proclamations for a National Day of Prayer," thus implicitly acknowledging the constitutionality of such practices. As Justice O'Connor explained, "Because of their history and ubiquity, those practices are not understood as conveying government approval of particular religious beliefs." Id. at 693.

Also informative are comments the Supreme Court has made concerning the constitutionality of the 1932 artistic rendition of Moses and the Ten Commandments contained in the frieze surrounding the walls of the highest court. For instance in Lynch, 465 U.S. at 676, in considering an Establishment Clause challenge the Court noted that "[t]he very chamber in which oral arguments on this case were heard is decorated with a notable and permanent--not seasonal--symbol of religion: Moses with the Ten Commandments." See also Allegheny, 492 U.S. at 652-53 (Stevens, J., concurring in part, dissenting in part) (noting that it "would be absurd to exclude" the inclusion of Moses, Confucius and Mohammed from

the Supreme Court's frieze because they are religious lawgivers). More recently, Chief Justice Rehnquist justified the presence of Muhammad in the north wall frieze in the Courtroom, stating "'[t]he depiction of Muhammad was intended only to recognize him, among many other lawgivers, as an important figure in the history of law; . . . It is part of an architectural and aesthetic unit that has been in place more than sixty years.'"). Suhre, 55 F.Supp.2d at 394 (quoting from a 1997 statement of Chief Justice Rehnquist).

The circuit courts have also accepted historical references to the Deity, upholding our national motto of "In God We Trust," and the same inscription on our currency, O'Hair v. Murray, 588 F.2d 1144 (5th Cir. 1979) (upholding national motto "In God We Trust"); Aronow v. United States, 432 F.2d 242 (9th Cir. 1970) (accord), as well as the constitutionality of the Pledge of Allegiance's reference to God. Sherman v. Community Consol. Sch. Dist. 21 of Wheeling Township, 980 F.2d 437 (7th Cir. 1992).

The reference to God on the Ten Commandments monument is much like these other references--an acknowledgment of our religious roots. While the display does not date back to our nation's founding, neither does the Pledge of Alliance's reference to God, or other such constitutionally approved religious references, such as the "In God We Trust" motto and inscription. Rather, many of the Deity references find their roots in our more recent history--the 1950's--just as the Ten Commandments monument in this case does. Therefore, in looking at the monument that still stands before Elkhart's Municipal Building, it is helpful to view it in light of the time it was placed there.

In the 50's the Cold War was daunting, and our country--as it often does in times of crisis--acknowledged the importance of God. See 100 Cong. Rec. 1700 (1954) ("[T]he fundamental issue which is the unbridgeable gap between America and Communist Russia is a belief in Almighty God.") (statement of Rep. Rabaut). In 1952, Congress established the "National Day of Prayer," H.R.J. Res. 382, 82d Cong., 2d Sess. (1952), recognizing that "the national interest would be much better served if we turn aside for a full day to pray for spiritual help and guidance from the Almighty during these turbulent times." 98 Cong. Rec. 771 (1952) (statement of Rep. Brooks). That same year, Justice Douglas, writing for the Supreme Court in Zorach v. Clauson, 343 U.S. 306, 313 (1952), penned the now-famous line: "[w]e are a religious people whose institutions presuppose a Supreme Being." The following year, in 1953, the House of Representatives voted to establish a

prayer room in the Capitol. H.R. Cong. Res. 60, 83d Cong., 99 Cong., 99 Cong. Rec. 9073 (1953). The Bill's sponsor explained that the legislation's purpose was to "provide a place of retreat as an encouragement to prayer. . . ." 99 Cong. Rec. 9073 (1953) (statement of Rep. Hays). Congressman Scrivner went further, explaining that "[a]t this time in the world's history, when the materialistic ideology of the Communists is . . . right in our own land, it is comforting to know that the Congress of the United States goes on record as believing in the spiritual values taught by all religions, and also showing to the world their belief in prayer and meditation as opposed to the barbarous teachings that so many nations have fallen prey to." 99 Cong. Rec. 9075 (1953) (statement of Rep. Scrivner).

In 1954, Congress added the phrase "one Nation under God" to the Pledge of Allegiance. This amendment came in response to a sermon delivered by the Reverend George M. Docherty at the New York Avenue Presbyterian Church in Washington D.C. at a service which President Eisenhower and several Senators and Representatives had attended. In his sermon, Reverend Docherty noted that our Pledge of Allegiance was missing something--something that would distinguish it from the pledge "little Muscovites might repeat" in a "pledge to their hammer-and-sickle flag in Moscow." Steven B. Epstein, Rethinking the Constitutionality of Ceremonial Deism, 96 Colum. L. Rev. 2083, 2118-19 (1996). That something was a recognition of God. After the President signed this legislation, the new Pledge of Allegiance was recited and a bugler played a rendition of "Onward, Christian Soldiers." 100 Cong. Rec. 6348 (1954) (statement of Sen. Ferguson).

The trend continued: In 1955 Congress mandated the inscription of "In God We Trust" on all coins and paper currency. The bill's sponsor, Representative Bennett, spoke on the bill's passage: "In these days when imperialistic and materialistic communism seeks to attack and to destroy freedom, it is proper for us to seek continuously for ways to strengthen the foundation of our freedom. At the base of our freedom is our faith in God and the desire of Americans to live by His will and His guidance. As long as this country trusts in God, it will prevail. To remind all of us of this self-evident truth, it is proper that our currency should carry these inspiring words, coming down to us through our history: 'In God We Trust.'" 101 Cong. Rec. 4384 (1955) (statement of Rep. Bennett). The following year, Congress codified "In God We Trust" as our national motto. See Act of July 31, 1956, Pub. L. No. 84-851 (codified at 36 U.S.C. sec. 186 (1994)). Two years later, in

1958, as part of its national project, the Elkhart Eagles chapter donated the Ten Commandments monument to the City of Elkhart.

As a nation, we are thankful the Communist wall of separation has fallen. And it is true that following the Supreme Court's Establishment Clause jurisprudence beginning in the 60's, our governments are increasingly restricted in invoking the name of God. We have numbed such invocations with terms such as "rote repetition," moments of silence, and "ceremonial deism." Yet that does not change the historical fact that the Ten Commandments served as the foundation for our country's legal system. A monument displaying the Decalogue acknowledges that fact without endorsing it. The Ten Commandments monument also serves as an historical headstone, not only for our nation's original foundation, but also for the 1950's, a religious time in America when as a nation we turned to God. A time when divorce, illegitimacy, drug abuse, murder, abortion, youth violence, and the other crises of today were still relatively rare.

In sum, I believe the retention of the 40-year-old Ten Commandments monument displayed outside Elkhart's Municipal Building is justified based on our country's early and more recent history as a "tolerable acknowledgment of beliefs widely held among the people of this country." Marsh, 463 U.S. at 783. Because of the Ten Commandments' history and ubiquity, it should be treated just as other accepted practices, such as the Supreme Court's frieze, the national Thanksgiving and Christmas holidays, congressional and military chaplains and the congressional prayer room, the national motto, the Pledge of Allegiance, presidential proclamations for a National Day of Prayer, and our own court's opening "God save the United States and this Honorable Court." Therefore, even if the Ten Commandments monument would fail the strictures of the Lemon test (which, in my view, it does not), I believe Elkhart may constitutionally leave it standing.

D. Remedy

Because I believe that Elkhart's decision to leave the Ten Commandments monument standing does not constitute an "establishment of religion," I would conclude that the monument's placement and design is fine as is. However, the court concludes otherwise, and thus is correctly concerned about the appropriate remedy. While I have no doubt that the City can locate an obscure hiding place for the monument, that should not be necessary. Cemeteries are full of monuments honoring times past. But this monument should not be exiled to the equivalent of a graveyard.

Perhaps it could remain in place if it could be sufficiently diluted with additional plaques and memorials. I don't think anyone would accept some sort of redaction whereby the preliminary references to God would be chiseled away or otherwise defaced. There must be some other way to minimize any perception of endorsement, and many communities and the State of Indiana seek guidance on where and how the Decalogue can be prominently displayed without offending the Constitution. Yet, if the court's decision in this case stands, there may be no remedy other than removal because the court concludes that the City lacked a secular purpose justifying its decision to leave undisturbed the Ten Commandments monument. Thus, it appears that under the court's reasoning, no matter what Elkhart does to dilute the religious aspects of the Ten Commandments, the monument will still be unconstitutional because its fails Lemon's first prong by not having a secular purpose. And if Elkhart cannot prove that it has a legitimate secular purpose by passing a resolution forty years after the monument was donated, there doesn't seem to be much else it could do to prove that it has sanitized any religious motive that has since become unconstitutional.

II.

To this point, I have examined most of the tests and distinctions set in place by the Supreme Court. While I am confident this analysis under Lemon is correct, I also recognize that reasonable people can disagree. See Lemon, 403 U.S. at 612 ("Candor compels acknowledgment . . . that we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law."). This variance of opinion is inevitable when one considers what Lemon requires: We look to the number of displays, their placement, their height, width, and distance from other displays ("scrutiny more commonly associated with interior decorators than with the judiciary"). American Jewish Congress, 827 F.2d at 129 (Easterbrook, J., dissenting). We question whether the symbol is religious, was religious, could be religious, or is both religious and secular. We try to look behind the words of legislators and Common Council members to measure their intent--history? God? Some of each? Some frustrated Justices have been led to discuss the absurdity of the Lemon test. See Lee v. Weisman, 505 U.S. 577, 644 (1992) (Scalia, J., dissenting) (stating that Lemon "has received well-earned criticism from many Members of this Court," and collecting opinions criticizing Lemon). See also, Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 398-99 (1993) (Scalia, J., concurring in

judgment) (collecting opinions criticizing Lemon). But in the end there has to be a Lemon test, or some other test now that the Court has departed from the text and original understanding of the Establishment Clause.

The Establishment Clause reads that "Congress shall make no law respecting an establishment of religion." "The Framers intended the Establishment Clause to prohibit the designation of any church as a 'national' one. The Clause was also designed to stop the Federal Government from asserting a preference for one religious denomination or sect over others." Wallace v. Jaffree, 472 U.S. 38, 113 (1985) (Rehnquist, J., dissenting). The Establishment Clause further sought "to protect state establishments of religion from federal interference." Lee, 505 U.S. at 641 (Scalia, J., dissenting) (emphasis added). See also, American Jewish Congress, 827 F.2d at 129 (Easterbrook, J., dissenting) ("The Establishment Clause was supposed to prevent the federal government from taxing for the support of a church or requiring religious observance."). What the Establishment Clause did not intend to do was to build a wall of separation, or to mandate that the government treat religion and irreligion equally. See, e.g., Wallace, 472 U.S. 38, 98 (Rehnquist, J., dissenting) (Madison "did not see it as requiring neutrality on the part of government between religion and irreligion."). See generally, Wallace, 472 U.S. at 91-114 (Rehnquist, J., dissenting); Lee, 505 U.S. at 631-46 (Scalia, J., dissenting); American Jewish Congress, 827 F.2d at 128-40 (Easterbrook, J., dissenting); Leonard W. Levy, The Establishment Clause: Religion and the First Amendment (1986).

History proves that, and "[t]he true meaning of the Establishment Clause can only be seen in its history." Wallace, 472 U.S. at 113 (Rehnquist, J., dissenting). See also, Lee v. Weisman, 505 U.S. at 632 (Scalia, J., dissenting) ("Justice Holmes' aphorism that 'a page of history is worth a volume of logic' applies with particular force to our Establishment Clause jurisprudence.") (internal citation omitted). History shows that "[f]rom our Nation's origin, prayer has been a prominent part of governmental ceremonies and proclamations. The Declaration of Independence, the document marking our birth as a separate people, 'appeal[ed] to the Supreme Judge of the world for the rectitude of our intentions' and avowed 'a firm reliance on the protection of divine Providence.'" Id. at 633. In fact, George Washington, in his first inaugural address, "after swearing his oath of office on a Bible, . . . deliberately made a prayer a part of his first official act as President." Id. And when Congress passed the first ten amendments to the

Constitution, "George Washington himself, at the request of the very Congress which passed the Bill of Rights, proclaimed a day of 'public thanksgiving and prayer, to be observed by acknowledging with grateful hearts the many and signal favors of Almighty God.'" Id. at 635. As Justice Rehnquist succinctly summarized: "History must judge whether it was the Father of his Country in 1789, or a majority of the Court which has strayed from the meaning of the Establishment Clause." Wallace, 472 U.S. at 113 (Rehnquist, J., dissenting).

The Lemon "three-part test represents a determined effort to craft a workable rule from a historically faulty doctrine; but the rule can only be as sound as the doctrine it attempts to service." Id. at 110. Lemon's view of the Establishment Clause "is demonstrably incorrect as a matter of history. And its repetition in varying forms in succeeding opinions of the Court can give it no more authority than it possesses as a matter of fact; stare decisis may bind courts as to matters of law, but it cannot bind them as to matters of history." Id.

For now, however, the history as viewed by these dissenting jurists has been displaced by the Lemon test. Until the Court returns to the original understanding of the Establishment Clause we are bound by Lemon, and we therefore are left to measure the dilution of the religious message and question the sincerity of the government's secular motive--neither task well suited to the judiciary. Nonetheless, even under these complicated standards, the Ten Commandments monument does not constitute an establishment of religion.

III.

The Ten Commandments monument serves several secular purposes, including a recognition of our country's legal, historical, and yes, religious roots. Any perceived endorsement of religion is diluted by Elkhart's incorporation of secular symbols on the monument--placing the Ten Commandments in context of this country's history--and by the existence of other secular monuments in Elkhart's municipal building parkway. Moreover, even if we were to conclude that the monument fails the strictures of the Lemon test, I believe that history and ubiquity justify Elkhart's decision to leave undisturbed a monument which has rested unobtrusively and undisturbed in front of its municipal building for more than forty years in recognition of our country's religious and legal roots. I therefore DISSENT from the court's holding that Elkhart's decision to leave in place the Ten Commandments

monument constitutes an establishment of religion, and its implicit mandate that it must be removed.

/1 WHEREAS, the issue of the Ten Commandments Monument outside Elkhart City Hall has been raised by a person who is represented by the Indiana Civil Liberties Union. The Indiana Civil Liberties Union has contacted the Mayor of the City of Elkhart and has stated that a lawsuit will be filed if the Ten Commandments Monument is not removed.

WHEREAS, in recognition of the historical significance of the Ten Commandments, the Fraternal Order of Eagles presented the Ten Commandments monument to the City of Elkhart in May, 1958. In addition to the Ten Commandments, the Monument contains symbols that reflect the cross cultural and historical significance of the Ten Commandments.

WHEREAS, the Ten Commandments Monument has stood outside in an unobtrusive location to the north of the entrance of City Hall since 1958. There are numerous other historical and cultural plaques, memorials, and monuments located south of the entrance of city hall, in the foyer just inside the city hall entrance, at the first floor open area of city hall, and at the second and third floor open areas of city hall; and

WHEREAS, the Ten Commandments have had a significant impact on the development of the fundamental legal principles of Western Civilization.

NOW, THEREFORE, BE IT RESOLVED BY THE COMMON COUNCIL OF THE CITY OF ELKHART, INDIANA, THAT:

The Ten Commandments Monument is a historical and cultural monument that reflects one of the earliest codes of human conduct. It is proper for the Ten Commandments Monument to remain and the defense of this position is strongly endorsed.

/2 The frieze contained on the south wall of the courtroom of the United States Supreme Court includes a procession of great lawgivers of history, including Hammurabi, the Babylonian king who developed the Code of Hammurabi, and Napoleon Bonaparte, Suhre v. Haywood County, N.C., 55 F.Supp.2d 384, 393, 395 (W.D.N.C. 1999), figures possibly recognizable to the learned lawyers arguing before the Supreme Court, but unlikely familiar to many laypersons.

/3 The court is concerned that this monument could have a religious meaning to someone approaching

the building because it uses the words "hallowed" and "holy." Opinion at 26-27. Considering the words in the context of the display and its location, however, demonstrates that there is nothing religious about the display. Rather, the ground is "hallowed" because freedom's "holy light" burns "here," and "here" is the municipal building where justice is served through the county government. The choice of the words "hallowed" and "holy" merely serve as a literary device to honor freedom; the words in context do not have a religious meaning. See Webster's Seventh New Collegiate Dictionary (G. & C. Merriam Co. 1972), offering alternative definitions for "hallow"--one religious, "to make holy," and one secular, "to respect greatly."

/4 While Anderson was decided before Stone v. Graham, 449 U.S. 39 (1980) (per curiam), Stone is distinguishable because it involved the posting of the Ten Commandments in the school setting. See infra at 54-56. In fact, the five-Justice majority in Stone did not even cite to Anderson-- the only circuit decision considering and approving the constitutionality of a Ten Commandments monument.

/5 Although the court insists "the monument certainly cannot be fairly characterized as a component of a comprehensive display of the cultural heritage of the people of Elkhart," the facts point to the opposite conclusion. Within the very small 25-foot-wide courtyard rest four historical displays, including a monument to freedom, the Revolutionary War monument, the Ten Commandments monument, and the Elk bas-relief. These displays represent various aspects of our country and Elkhart's history, and encompass themes relevant to the offices located inside the Municipal Building, including not just the city court, but also the mayor's office, the human relations department, and the offices of the Common Council. Given the limited space available, it is impossible to get much more "comprehensive" than the current display. A more compact layout could lose what Elkhart strived to create--an aesthetically pleasing visual display, centered by the Elk bas-relief and balanced by the other monuments that flank the walkway. Nor does a display have to be "comprehensive" to dilute the religious aspect of one exhibit, as is clear from the Supreme Court's decisions in Lynch and Allegheny--displays which were far from comprehensive.

/6 In fact, the differences between the monument at issue in this case and the display challenged in American Jewish Congress are very similar to the differences the Supreme Court faced in Allegheny: the creche, which was unconstitutionally favored

by its prominent and solitary placement inside the county courthouse, and the menorah, which was constitutionally located outside the courthouse near a Christmas tree and a sign saluting liberty. As noted, the location proved dispositive in Allegheny.

/7 The text of the Ten Commandments monument listed twelve commands so as to serve as an amalgamation of the Jewish, Protestant and Catholic versions of the Ten Commandments. The first six commands refer to God or the Sabbath, while the last six do not. Opinion at 6.

/8 In this last regard, the Common Council's resolution not only explains its secular purpose, but also serves to inform the citizenry that Elkhart has no desire to endorse religion--it is merely acknowledging religion's role in our country's history. Or in the court's language, Elkhart in passing the resolution has "taken steps to 'obviate its religious purpose.'" Opinion at 20 n.8.