In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3011

Indiana Civil Liberties Union, Joan Laskowski,
Alice Bennett, et al.,

Plaintiffs-Appellees,

v.

Frank O'Bannon, Governor of Indiana,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 00 C 811--Sarah Evans Barker, Judge.

Argued January 9, 2001--Decided July 27, 2001


   Before Flaum, Chief Judge, and Bauer and
Coffey, Circuit Judges.

   Bauer, Circuit Judge.  This case comes to
us upon the district court's grant of a
preliminary injunction. On appeal, the
dispute concerns whether plaintiffs are
likely to succeed on the merits. Akin to
our recent decision in Books v. City of
Elkhart, 235 F.3d 292 (7th Cir.
2000),/1 we must determine whether a
monument to be placed on state government
property will violate the Establishment
Clause of the First Amendment to the
United States Constitution made
applicable to the states through the
Fourteenth Amendment. "This task requires
that we examine the history of the
monument's placement and maintenance as
well as the physical characteristics of
the monument and of the surrounding
area," Books, 235 F.3d at 294, and then
apply the test articulated in Lemon v.
Kurtzman, 403 U.S. 602 (1971). We have
completed this work and affirm the
district court's entrance of the
preliminary injunction pending resolution
on the merits.

BACKGROUND

   As detailed in Books, 235 F.3d at 294-
95, the Fraternal Order of the Eagles
donated plaques inscribed with a version
of the Ten Commandments (developed by

representatives of Judaism, Protestantism, and Catholicism) to communities across the United States during the 1950s. In 1958, one of the plaques was erected on the Indiana Statehouse grounds in downtown Indianapolis, where it stood until smashed by a vandal in 1991. Indiana State Representative Brent Steele arranged for the creation of a new monument to replace the destroyed plaque. The Indiana Limestone Institute generously agreed to donate both limestone and labor for this purpose. Steele, also an attorney, surmised that it would be legally prudent if, in addition to the Ten Commandments, the new monument displayed historical texts. The texts he chose were the Bill of Rights from the United States Constitution and the Preamble to the 1851 Indiana Constitution.

The planned monument consists of two pieces of limestone--a four-sided block resting upon a rectangular base-- and will weigh 11,500 pounds. The two wider sides of the four-sided block are carved into rounded arcs at the top, which resemble tablets, a form typically used in artistic depictions of the stone tablets delivered by Moses upon returning from Mt. Sinai. The monument will stand seven feet tall; six feet, seven inches wide; and four feet, seven inches deep. On one of the wide surfaces, the following version of the Ten Commandments will be engraved in one inch, all capital lettering:

Ten Commandments

I. Thou shalt have no other Gods before me

II. Thou shalt not make unto thee any graven image

III. Thou shalt not take the name of the Lord thy God in vain

IV. Remember the Sabbath day to keep it holy

V. Honor thy father and thy mother that thy days may be long in the land which the Lord thy God giveth thee

VI. Thou shalt not kill

VII. Thou shalt not commit adultery

VIII. Thou shalt not steal

IX. Thou shalt not bear false witness against thy neighbor

X. Thou shalt not covet thy neighbor's house or wife or anything that is thy neighbor's

The other wide surface will display the Bill of Rights in five-eighths inch, all capital lettering. On one of the smaller sides the 1851 Indiana Constitution Preamble will be inscribed, which states:

To the end, that justice be established, public order maintained, and liberty perpetuated: We, the People of the State of Indiana, grateful to Almighty God for the free exercise of the right to choose our own form of government, do ordain this Constitution.

The 1851 Preamble will not be clearly identified as such. The other small side will read:

Gift of the Indiana Limestone Industry-- 2000 A.D.

This monument replaces one donated by the Aeries and Auxiliaries of the Indiana Fraternal Order of the Eagles on October 25, 1958

The record is not clear as to the exact size of the lettering for the 1851 Preamble and the dedication.

   The Statehouse park-like grounds span almost two acres and are home to many Indiana government buildings, including the Capitol Building, the Governor's office, the General Assembly, the Indiana Supreme Court, the Indiana Court of Appeals, and other state offices. The grounds are surrounded by Ohio Street to the north, Washington Street to the south, Capitol Avenue to the east, and Senate Avenue to the west. There are numerous monuments currently on the grounds, including two monuments honoring the civil engineering of the National Road (U.S. Highway 40), a marker honoring the women of Indiana, two friezes depicting Civil War scenes, a marker describing the Statehouse's history, and statues of Christopher Columbus, George Washington, a coal miner, and Indiana

Governors Thomas A. Hendricks and Oliver H.P. Morton. The grounds also showcase seven dedicated trees. The planned site for the monument at issue in this case is the southwest corner of the grounds, about forty-one feet from one of the trees and ninety-two feet from the National Road monument, although precisely where and in what direction it will face is as of yet undetermined.

In May of 2000, plaintiffs filed an action under 42 U.S.C. sec. 1983, claiming that acceptance of the monument and the plan to erect it on the grounds of the Indiana Statehouse was state action that violated the Establishment Clause. On July 28, 2000, the district court granted plaintiffs' motion for a preliminary injunction precluding the State from erecting the monument pending resolution on the merits. See Indiana Civil Liberties Union v. O'Bannon, 110 F. Supp. 2d 842 (S.D. Ind. 2000)./2 The district court held that the plaintiffs had demonstrated a likelihood of success on the merits by showing that the state action violated both of the first two prongs of the Lemon test.

Under the first prong of the Lemon test, the district court reasoned that the State's purpose in displaying the monument was to advance religion because the State had not shown a historical link between most of the Ten Commandments and the ideals of government and the legal system, that the monument's tablet-shaped design was religious in nature, the Ten Commandments would be displayed apart from the other texts, and there was no explanation on the monument that the Ten Commandments was being displayed for its historical significance. Under the second prong, the district court reiterated that the content, shape, size, design, permanence, and location at the seat of Indiana's government, would lead a reasonable observer to believe that the Ten Commandments were "marked with the stamp of government approval."

The State's appeal asks for the vacation of the preliminary injunction because the plaintiffs have not shown that they are likely to succeed on the merits.

DISCUSSION

A preliminary injunction is an

extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved. A preliminary injunction may be issued only if the moving party demonstrates some likelihood of success on the merits, an inadequate remedy at law, and irreparable harm if denied. If these elements are demonstrated, the court must balance the irreparable harm the nonmovant will suffer if relief is granted and the irreparable harm to the movant if relief is denied. The court must also consider the public interest in either the grant or denial of the relief. When a district court grants a preliminary injunction, we review conclusions of law de novo and findings of fact for clear error while giving substantial deference to the district court's discretionary acts of weighing evidence or balancing equitable factors. See Cooper v. Salazar, 196 F.3d 809, 813 (7th Cir. 1999).

Deciding the merits of this case involves the application of the Lemon test. Under Lemon, the Establishment Clause is violated if any of the following are found: (1) the state action does not have a secular purpose; (2) the primary effect of the state action is the advancement or inhibition of religion; or (3) the state action fosters excessive entanglement with religion. See 403 U.S. at 612-13. In this case, the parties only invoke the first two prongs, which have been refined and dubbed the "endorsement test." See Books, 235 F.3d at 301. Under the endorsement test we focus on whether the state's action has the purpose or effect of conveying a message of endorsement or disapproval of religion. See id. at 302.

I.  Secular Purpose

Under the first prong of the Lemon test, we ask whether the State's actual purpose in planning to erect this monument on the Statehouse grounds is to advance or inhibit religion. See id. We have recognized that the Ten Commandments is a religious and sacred text that transcends secular ethical or moral concerns. See id. This is so in part because its very text commands the reader to worship only the Lord God, to avoid idolatry, to not use the Lord's name in vain, and to observe the Sabbath. These particular commandments are wholly religious in

nature, and serve no conceivable secular function. Yet, we have also recognized that the Ten Commandments "can no doubt be presented by the government as playing . . . a role in our civic order." Id. at 302-03 (recognizing the secular nature of the frieze on the wall of the United States Supreme Court depicting Mosesholding the Ten Commandments alongside other "great lawgivers" or the secular use of the Ten Commandments in public schools to study history, civilization, ethics, or comparative religion).

Since displaying the text of the Ten Commandments may have a legitimate secular purpose, the state bears the bur den of demonstrating "that it has taken steps to 'obviate its religious purpose.'" Id. at 303 n.8 (quoting Gonzales v. North Township, 4 F.3d 1412, 1421 (7th Cir. 1993)). We generally defer to the purpose offered by the state for its action as long as it is not a sham. Beyond assessing the purpose expressly articulated by the state, we ensure that the stated secular purpose is legitimate by also examining the context and the content of the display. See id. at 302-04.

Since the new monument will be significantly different than the 1958 version, we do not rely on the stated purpose for the display of the 1958 plaque. Therefore, the March 14, 2000 press release issued by Governor O'Bannon announcing that Indiana would accept the new monument provides the state's stated purpose for agreeing to erect the monument. In the press release, Governor O'Bannon stated:

For more than three decades, a monument inscribed with the Ten Commandments stood on the Statehouse lawn as a reminder of some of our nation's core values. Soon those words will stand alongside the biding principals of our form of government, especially its protections of individual rights. They're ideals we all need to be reminded of from time to time.

Citing State v. Freedom From Religion Found., Inc., 898 P.2d 1013 (Colo. 1995), the State adds that the display reflects the ideals of our legal system. Regarding the context of the monument, Governor O'Bannon stated: "The new monument will

be an integral part of the Statehousesetting, which honors the history of our state and our nation." As for the monument's content, the State points out that most of the words displayed on it are secular in nature. In sum, the State says that the monument is intended to honor our history by reminding society of its core values and to honor our legal tradition since several of our secular laws are parallel to the Ten Commandments.

We start by saying that the display of secular texts along with the Ten Commandments does not automatically lead to a finding that the purpose in erecting the monument is primarily secular. The Ten Commandments is still an inherently religious text, and we conclude that the State has not articulated a valid secular justification for planning to erect the monument.

The stated purpose that the Commandments will remind society of its "core values" is akin to the purpose of providing a "code of conduct" rejected in Books. We stated: "The code chosen, however, was a religious code that focuses not only on subjects that are the legitimate concern of civil authorities, but are subjects that are beyond the ken of any government and that address directly the relationship of the individual human being and God." 235 F.3d at 303. The Commandments are historical, secular "core values" only to those who adhere to them. This is all the more true since the version here, as noted, maintains the religion-based commandments. Moreover, since each text stands apart, the monument's physical design belies any suggestion that these texts are presented as a whole to remind viewers of the core values and legal ideals of our nation. While we hold that the State's articulated purposes are not secular ones, we go on to consider the next prong of the Lemon test.

II.  Primary Effect

Under the second prong, we ask, irrespective of the state's stated purpose, whether accepting this monument for display on the Statehouse grounds has the primary effect of conveying a message that the state is advancing or inhibiting

religion. See id. at 304. The question is: would a reasonable person believe that the display amounts to an endorsement of religion? "An important concern of the effects test is . . . whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." Id. at 305 (quotations omitted). Again, to answer these questions we examine the content and context of the display. See id. at 304-06.

The State argues that the other statues and monuments help neutralize any religious message emanating from the Ten Commandments because they lend a historical context. It is true that the grounds house other statues and monuments, which certainly helps the State's case because the grounds are somewhat akin to a museum, and "a typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content." Lynch v. Donnelly, 465 U.S. 668, 692 (1983) (O'Connor, J., concurring). But, this is not simply some museum nestled in some secluded park. The grounds, which house, among other things the Capitol, the Governor's office, the General Assembly, the Indiana Supreme Court, and the Indiana Court of Appeals, is the seat of Indiana government. "[We subject] to particularly careful scrutiny displays at the seat of government." Books, 235 F.3d at 305 (discussing Harris v. City of Zion, 927 F.3d 1401 (7th Cir. 1999); American Jewish Congress v. City of Chicago, 827 F.2d 120 (7th Cir. 1987)). Given that these grounds are home to all of the branches of Indiana's government, we are hard-pressed to conclude anything other than that a reasonable observer would think that this monument, regardless of the message it conveys, occupies this location with the support of the state government. And, since we find that a reasonable observer would think the monument conveys a religious message, we hold that it impermissibly endorses religion.

The large limestone monument, weighing

just under six tons and standing seven feet tall and four feet wide, will be a permanent fixture on the Statehouse grounds. Its very format conveys a religious message. The limestone blocks are tablet-shaped, so, particularly given its height, even from afar the religious nature of the monument is suggested to observers. The lettering of the Ten Commandments is larger (one inch capital lettering) than the Bill of Rights inscribed on the other side (five-eighths inch capital lettering), making the Commandments more prominent to observers. The State explains that the lettering sizes are difference because the Ten Commandments consists of fewer words than that of the Bill of Rights, and therefore, the lettering of the Bill of Rights is necessarily smaller so that it can fit on the face of the stone.

While this is an eminently reasonable reason, it is of no matter unless a reasonable observer would surmise such, which we doubt. But, even if a reasonable observer would surmise such, the fact that the Ten Commandments is in larger lettering also means that it can be observed more clearly from a distance. And, depending on from which direction an observer approaches, he or she may only view the Commandments by peering back, for it stands alone on one side, totally isolated from the other texts. So, approaching from one side, an observer would only see the Ten Commandments, reasonably leading he or she to believe that the monument only displayed the sacred text.

The placement of the texts on different sides also inhibits observers from visually connecting the texts. We further hazard that since the texts are not visually connected, a reasonable observer would be hard-pressed to make any analytical connection between the texts, particularly since the planned monument lacks any marker explaining why these particular texts have been combined, although somewhat separately, on one slab of limestone. A reasonable observer would not necessarily link all three of these texts to society's legal development and history. A reasonable person will think religion, not history.

Nothing in the context of the monument itself or the surrounding grounds

mitigates the religious message conveyed. The monument is a display distinct both in its placement by other statues and monuments and in its content. See generally County of Allegheny v. ACLU, 492 U.S. 573, 598 n.48 (1988). There are no other monuments or statues directly near this one and there is no unifying historical or legal significance between this monument and the others.

Moreover, an observer who views the entire monument may reasonably believe that it impermissibly links religion and law since the Bill of Rights and the 1851 Preamble are near the sacred text. This would signal that the state approved of such a link, and was sending a message of endorsement. See Books, 235 F.3d at 307 (finding that the placement of the American Eagle gripping the national colors at the top of a plaque inscribed with the Ten Commandments endorsed a link between religion and civil government); City of Zion, 927 F.2d at 1412 (finding that the placement of a Latin cross surrounded by other symbols of city life on a municipality's corporate seal endorsed a link between Christianity and government).

The permanence, content, design, and context of the monument amounts to the endorsement of religion by the state. Our holding is in regards to the likelihood of success on the merits based on the facts available to us at this preliminary stage, but we are hard-pressed to believe that a trial on the merits will support a different conclusion. See ACLU v. City of St. Charles, 794 F.2d 265, 269 (7th Cir. 1986).

CONCLUSION

We AFFIRM the district court's entrance of the preliminary injunction, pending resolution on the merits.

FOOTNOTES

/1 On May 29, 2001, the Supreme Court denied the petition for a writ of certiorari in our opinion in Books. See Elkhart v. Books, 121 S. Ct. 2209, 2209 (2001). Chief Justice Rehnquist, joined by Justices Scalia and Thomas dissented from the denial of certiorari, and Justice Stevens issued a statement in support of the denial. Justice Stevens wrote:

Even though the first two lines of the monument's text appear in significantly larger font than the remainder, they are ignored by the dissenters. Those lines read: "THE TEN COMMANDMENTS--I AM the LORD thy GOD." The graphic emphasis placed on those first lines is rather hard to square with the proposition that the monument expresses no particular religious preference . . . .

121 S. Ct. at 2210. The denial of certiorari in Books, coupled with Justice Stevens' statement, makes our reasoning and decision in this case all the more sound.

/2 Shortly after entrance of the preliminary injunction in this case, Representative Steele asked the President of the Lawrence County Commissioners, Timothy P. Terry, if the monument could be erected on the Lawrence County Courthouse lawn until a decision in this appeal was issued. The Commission voted to accept the monument for display. Not surprisingly, the erection of the monument on the Courthouse lawn spurred the filing of an identical case, which is also being handled by Judge Barker. See Kimbley v. Lawrence County, 119 F. Supp. 2d 856 (S.D. Ind. 2000).

   Coffey, Circuit Judge, dissenting.  I do not disagree with the majority's presentation of the facts at issue before us. The state of Indiana plans to erect a monument on Indiana Statehouse grounds that is to be engraved on various sides with the Ten Commandments, the Bill of Rights, and the Preamble to the Indiana Constitution ("Preamble") on its sides. The plan to erect the monument originated after vandals destroyed a monument inscribed with the Ten Commandments, which had previously stood on the Statehouse grounds since 1958. I respectfully dissent because I believe that applying Lemon and its progeny should lead us to the conclusion that the proposed monument by the State of Indiana is not constitutionally prohibited under the Establishment Clause.

I.  Lemon Test

   In Lemon v. Kurtzman, 403 U.S. 602 (1971), the Supreme Court adopted a three-part test for analyzing Establishment Clause cases. Initially, the government's challenged practice must have a secular purpose. Second, the principal or primary effect must be one that neither advances nor inhibits religion. Third, the government's practice must not create an excessive entanglement of religion. Because the third prong is not at issue, the discussion focuses on the first two

prongs.

The Lemon test continues to be criticized. See, e.g., Santa Fe Indep. Sch. Dist. v. Doe, 120 S.Ct. 2266, 2284-85 (2000) (Rehnquist, C.J., dissenting); Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 398-99 (Scalia, J., concurring in judgment); Committee for Pub. Educ. & Religious Liberty v. Regan, 444 U.S. 646, 671 (1980) (Stevens, J., dissenting). Although the Lemon test remains theframework under which we analyze an Establishment Clause issue, I believe it helpful to always bear in mind the text of the First Amendment, which is fundamental and clear:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.

U.S. Const., amend. I (emphasis added).

The Establishment Clause was intended to prohibit the establishment of a national church and also to prohibit the Federal Government from preferring one religious denomination over others. See Wallace v. Jaffree, 472 U.S. 38, 113 (1985) (Rehnquist, J., dissenting). It was never intended to "build a wall of separation" between government and religion. See id. at 98 (Rehnquist, J., dissenting). The wholesome neutrality guaranteed by the Establishment and Free Exercise Clauses does not dictate the obliteration of all the nation's religious traditions. Indeed, as the Supreme Court has noted, "no significant segment of our society and no institution within it can exist in a vacuum or in total or absolute isolation from all the other parts, much less from government." Lynch v. Donnelly, 465 U.S. 668, 673 (1984). The Constitution does not "require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." Id. (emphasis added)./1

Judges and legal scholars agree that the Lemon test has led to inconsistent results. See Wallace, 472 U.S. at 110-11 (Rehnquist, J. dissenting) (discussing inconsistencies brought about by the Supreme Court's Establishment Clause jurisprudence). It is possible to pick and choose from the myriad of case law dealing with the Establishment Clause to find case law to suit each and every position on any given factual situation. For example, public monuments invoking the deity offend the Constitution, but mottos emblazoned on coins or religious language contained in Constitutions or in the Bill of Rights do not. Teenagers may not participate in school-organized prayer at football games, but Congress, the

courts, and state legislatures may open sessions with a prayer. In the end, the Court annually picks the winners and losers in a game of free-exercise roulette, expanding or contracting the Establishment Clause as it sees fit to permit or deny the claimed exemption in a given term. Nevertheless, I acknowledge without hesitation that we are bound to apply Lemon, though I contend that no matter how the test is applied in the factual situation before us, the proposed monument can withstand constitutional scrutiny.

A.  Secular Purpose

   Under Lemon, the government's challenged practice must have a secular purpose. In determining whether a secular purpose exists, the Supreme Court merely requires that the displays not be "motivated wholly by religious considerations." Lynch, 465 U.S. at 680. This monument consists of three sides--two of which are completely secular in nature. Simply because some religious meaning is conveyed by a monument does not destroy a state's valid secular purposes for its display. See Lynch, 465 U.S. at 680; Bridenbaugh v. O'Bannon, 185 F.3d 796, 800 (7th Cir. 1999).

   The majority concludes that "[t]he Ten Commandments is still an inherently religious text, and . . . that the State [of Indiana] has not articulated a valid secular justification for planning to erect the monument." The Commandments are a "sacred text in the Jewish and Christian faiths," concerning, in part, the "religious duties of believers." Stone v. Graham, 449 U.S. 39, 41-42 (1980). But neither Stone, nor any other Supreme Court decision for that matter, even suggests that the Ten Commandments are without a secular significance. Indeed, Stone noted that "integrated into the school curriculum" the Commandments "may constitutionally be used in an appropriate study of history, civilization, [or] ethics." Id. at 42.

   The text of the Ten Commandments "no doubt has played a role in the secular development of our society and can no doubt be presented by the government as playing such a role in our civic order." Books v. City of Elkhart, 235 F.3d 292, 302 (7th Cir. 2000). Six of the Ten Commandments are, in fact, wholly secular, and form the basis of much of our modern codes of criminal conduct. The historic, secular nature of the Ten Commandments is recognized inside the walls of the United States Supreme Court, one of which is adorned with a frieze that contains Moses holding the Ten Commandments, alongside other historic figures, both religious and secular. See County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U.S. 573, 652

(1989) (Stevens, J., concurring in part and dissenting in part). Justice Stevens stated that the placement of these historic figures together on the frieze signals a respect for great lawgivers, not great proselytizers, which is a fitting message for the wall of a courtroom. See id. at 652-53. If the Ten Commandments properly convey a secular message when adorning the wall of a Federal Courtroom, I cannot understand how the State of Indiana's proposed placement of the three-sided monument amidst twelve other secular symbols of the nation's legal and cultural history fails to similarly convey a secular message. I do not understand why the majority reasons that but four lines on the monument (those four Commandments that reference God) so overshadow the remainder of the monument (which includes the Bill of Rights and the Preamble to the Indiana Constitution) such that the majority concludes the monument has no secular purpose whatsoever.

Here, the State of Indiana has architecturally blended the text of the Ten Commandments with two other important legal texts--the United States Bill of Rights and the Preamble to the Indiana Constitution (not to mention the twelve other secular monuments with which it would share the Statehouse lawn). The explicit language of the Preamble further reflects the secular message of the monument. The Preamble to the Indiana constitution states three goals: 1) for "justice [to] be established"; 2) for "public order [to be] maintained"; and 3) for "liberty [to be] perpetuated". The three goals espoused by the Preamble, reinforced by the freedoms contained in the Bill of Rights, clearly serve to secularize the monument, memorializing the cornerstones of our civilization's law.

The majority somehow suggests that the design and construction of the monument belies any intention to convey a secular message. Respectfully, I am forced to disagree. It seems to me that the majority is overly concerned with the design of the monument. This court, nor any other court, should not be in the business of monument design. If the State of Indiana believes that it is aesthetically pleasing (or more conducive to conveying a historical message) to erect the monument as designed, it should be permitted to do so without the court making the assumption based only on a foundation of quicksand that a reasonable observer will glance only at a single side or glance only at the side bearing the larger letters. I believe that a court's inquiry should focus on the reasonable observer viewing the display in its entirety, and not on an observer's potential misperception of an isolated aspect of the display. When any person focuses on only one particular aspect of a monument or

display to the exclusion of the other aspects it will distort even the most reasonable observer's opinion. It seems far more reasonable to assume that a person taking the time to gaze upon the beautiful edifice will look at all three sides, and draw conclusions from the whole--which presents three important steps in the development of the law as they affect 1) the people of the world; 2) the citizens of the United States; and 3) the citizens of the State of Indiana.

Further, because the Preamble to the Indiana Constitution would occupy the smaller side of the monument between the Ten Commandments and the Bill of Rights, its message, "that justice be established, public order maintained, and liberty perpetuated," would link the Ten Commandments with the Bill of Rights and convey a secular message of the fundamental legal principles which form the basis of our national history and culture.

Indiana Governor O'Bannon explicitly articulated the secular purpose of the monument, stating that it was to be "an integral part of the Statehouse setting, which honors the history of our state and our nation." The Governor's March 14, 2000, press release further stated that the Ten Commandments "stood on the Statehouse lawn as a reminder of some of our nation's core values . . . [and that] [s]oon those words will stand alongside the abiding principals of our form of government, especially its protections of individual rights. They're ideals we all need to be reminded of from time to time."

We are "normally deferential" to "articulation[s] of secular purpose," so long as they are "sincere and not a sham." Edwards v. Aguillard, 482 U.S. 578, 586-87 (1987). "This is in keeping with the well settled maxim that courts are 'reluctan[t] to attribute unconstitutional motives to the States, particularly when a plausible secular purpose for the State's program may be discerned. . . .'" Cohen v. City of Des Plaines, 8 F.3d 484, 489 (7th Cir. 1993) (quoting Mueller v. Allen, 463 U.S. 388, 394-95 (1983)).

The majority attempts to downplay Governor O'Bannon's press release, stating that reminding society of its "core values" is akin to the purpose of providing a "code of conduct" rejected in Books. But this is not the same case as Books, and "[e]very government practice must be judged in its unique circumstances. . . ." Allegheny, 492 U.S. at 595. In Books, the only text set forth on the single monument at issue was that of the Ten Commandments. In the factual situation before us, the Ten Commandments stands joined with the Bill of Rights and the Preamble to the

Indiana Constitution, thus linking the three texts and conveying a secular message regarding our nation's legal history. The Governor's well-reasoned message in his press release cannot and should not be construed as shallow words without meaning or sincerity.

Nevertheless, the majority here, partially based on the recent decision in Books, 235 F.3d at 303-04, seems to go out of its way to second guess Governor O'Bannon's stated purpose for the proposed monument in an attempt to discredit that purpose. The Governor (and also the Elkhart City Council, in Books) should be presumed to have fulfilled the duties of his office with honesty and integrity. There is not one iota of evidence of insincerity here, and in my opinion no justification for the majority's refusal to give credit to the state's articulated purpose. See, e.g., American Jewish Congress v. City of Chicago, 827 F.2d 120, 127 (7th Cir. 1987) (relying on affidavit from mayor's chief of staff stating secular reasons to attract visitors to downtown businesses and to take official note of Christmas to find a secular reason behind a nativity display and noting "the absence of any evidence that the city's stated purposes behind the display of the nativity scene are merely a sham"); Bridenbaugh, 185 F.3d at 799 (relying on testimony offered during litigation as to Indiana's purpose for giving employees a Good Friday holiday).

I believe that the proposed monument conveys a secular message that honors and pays due homage to our nation's legal history. Accordingly, I would hold that the monument satisfies the first prong of the Lemon test requiring a valid secular purpose.

B.  Principal or Primary Effect

The second prong of Lemon focuses on whether the government's practice has the principal or primary effect of advancing or inhibiting religion. Freedom From Religion Foundation, Inc. v. City of Marshfield, 203 F.3d 487, 493 (7th Cir. 2000). Under this prong we ask only in the case before us whether an "objective observer" would perceive the display as a state endorsement of religion. See Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 308 (2000). The appropriate inquiry is thus, whether a citizen knowing the totality of the facts and circumstances surrounding the placement of the proposed monument would believe that the State of Indiana and its officials seek to endorse, rather than merely respect and tolerate, religion by placing it on the Statehouse lawn. See Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 777 (1995) (O'Connor,

J., concurring). "A policy which tolerates reli-
gion, [however], does not improperly endorse it."
Chandler v. Siegelman, 230 F.3d 1313, 1317 (11th
Cir. 2000) (emphasis in original).

   Even recent decisions of the Supreme Court have
looked favorably upon the constitutionality of
government displays of purely religious symbols--
a creche and a menorah--when those symbols were
part of a larger display, as in the factual
situation before us. See Lynch, 465 U.S. at 686;
Allegheny, 492 U.S. at 617-18; see also Books,
235 F.3d at 316-18 (Manion, J., dissenting)
(discussing Lynch and Allegheny). The Court's
guidance appears to be that where the religious
display--the creche in Allegheny--stood alone, it
violated the Establishment Clause. Allegheny, 492
U.S. at 598-99.

   As Lynch and Allegheny teach, the inquiry into
whether the display of a religious symbol vio-
lates the Establishment Clause turns upon the
context in which the symbol appears. In this
case, the Ten Commandments is not the only text
to be inscribed on the monument, but instead is
only one portion of the display, to be accompa-
nied the Bill of Rights and the Preamble to the
State of Indiana's Constitution.

   The majority curiously suggests, however, that
an observer who views the entire display may
reasonably believe that it links religion and law
since the Bill of Rights and the Preamble are
near the Commandments. The cases the majority
cites for this proposition are distinguishable.
In Books, 235 F.3d 292, and Harris v. City of
Zion, 927 F.3d 1401 (7th Cir. 1999), the reli-
gious symbol was directly linked to a governmen-
tal symbol--an American Eagle gripping the na-
tional colors atop a plaque inscribed with the
Ten Commandments and a Latin cross surrounded by
other symbols of city life on a municipality's
corporate seal. Here the monument does not join
government symbols (such as the American Eagle or
a municipality's seal) with religious symbols or
text.

   Moreover, the layout of monuments that adorn
the Statehouse lawn also serves to diminish any
perceived endorsement of religion that may alleg-
edly flow from the monument at issue. The pro-
posed monument would share the Statehouse lawn
with twelve other monuments--all wholly secular
in nature, thereby emphasizing the secular as-
pects not only of the proposed monument but of
the entire designated area. For instance, among
the twelve other monuments are busts and statues
of historic figures--Christopher Columbus, George
Washington, and Robert Dale Owen. There are
statues of former Indiana Governors Thomas A.

Hindricks and Oliver H.P. Morton. There are monuments commemorating historic events and ideals of liberty--two Civil War friezes and two monuments dedicated to the National Road. There is also a statue of a coal miner to honor Indiana's coal mining history and a marker honoring the Statehouse itself. In short the Statehouse lawn is an area dedicated to monuments that pay due homage to both the state's and the nation's history that serves to situate the monument in an appropriate cultural and historical context.

As the Supreme Court clearly noted in Lynch, in applying the second prong of the Lemon test a court should not focus exclusively on the religious symbol, but within the context in which the symbol appears. Lynch, 465 U.S. at 680. In Lynch, the Court allowed the city of Pawtucket, Rhode Island to erect a holiday display that included a crechedepicting the nativity scene where that creche was surrounded with other secular symbols, such as reindeer, Santa Claus, candy-striped poles, teddy bears, among others. Lynch, 465 U.S. at 671. Here, the context of the proposed monument, placed amongst the twelve other secular markers honoring Indiana's and the nation's history, only serves to reinforce the secular nature of the monument in question as set forth and clearly delineated in Governor O'Bannon's press release. The twelve secular monuments that would share the Statehouse lawn with the proposed monument create a museum-like setting that effectively and persuasively does away with any conceivable endorsement of religion that would flow from the proposed monument.

The majority suggests that the other monuments would be too far away to contribute to the secular message of the proposed monument. I fail to see what effect the distance between the monuments upon the very beautiful plot of land has upon our analysis. Indeed the proposed monument is not given a special place on the Statehouse lawn any more than any of the other memorial edifices. Instead, it would be merely just one of a number (12) of monuments on the lawn. In my view, the vastness of the grounds, coupled with the number and diversity of the subject matter of the monuments, dilutes even the slightest perceived endorsement of religion flowing from the proposed monument. Accordingly, I conclude that the proposed monument does not constitute an endorsement of religion. Because it also satisfies and fits within the parameters of the other prongs of Lemon, I would further hold that it does not violate the Establishment Clause.

II. Historical Practices

Even if the proposed monument was found not to

satisfy the requirements of Lemon, which I am convinced it does, I still would dissent from the majority's opinion. Where a religious symbol has a landmark foundation and meaning in the history of our country the Supreme Court has side-stepped the strictures of Lemon to avoid a result contrary to the clear intent of the Framers of the Constitution. Then-Justice Rehnquist discussed at length the history and intent of the Framers who crafted the First Amendment in Wallace, 472 U.S. at 95-114 (Rehnquist, J., dissenting). I share in the view that the First Amendment was never intended to be read in a wholly secular fashion, as if its objective were to remove all religious expression from the public square and to prefer irreligion over religion.

Our Nation's history is replete with religious symbols "linked" in some way to the government. Indeed, George Washington, at the request of the Congress that passed the Bill of Rights, proclaimed, Thanksgiving to be a day of "prayer to be observed by acknowledging with grateful hearts the many and signal favors of Almighty God." See id., 472 U.S. at 113. Washington further declared Thanksgiving "to be devoted by the people of these states to the service of that great and glorious Being who is the beneficial author of all the good that was, that is, or that will be . . . [and] that we may all unite in rendering unto Him our sincere and humble thanks for his kind care and protection of the people of this country . . . and, in general, for all the great and various favors which He has been pleased to confer upon us . . . and beseech Him to pardon our national and other transgressions . . . to promote the knowledge and practice of true religion and virtue . . . and to grant all mankind a degree of temporal prosperity as He alone knows best." George Washington, Proclamation: A National Thanksgiving (reprinted in 5 Founders' Constitution 94). Similarly, Thomas Jefferson signed treaties with Indian tribes that provided annual cash support in order for a Roman Catholic priest to provide services for the tribes. Wallace, 472 U.S. at 103.

Washington's and Jefferson's examples have been followed as the practice of Congressional prayer has continued uninterrupted since the very first Congress. Moreover, each Congress elects (and pays a salary to) a Chaplain to preside over this practice. See Marsh v. Chambers, 463 U.S. 783, 788-89 & n.10 (1982). The Supreme Court (and this court) open their sessions with an declaration that states "God save the United States and this Honorable Court." Marsh, 463 U.S. at 786; Zorach v. Clausen, 343 U.S. 306, 312-13 (1952). Numerous other governmental practices pay homage to our religious heritage, including national holidays

such as Christmas and Thanksgiving, military chaplains, the motto, and the Pledge of Allegiance. See Lynch, 465 U.S. at 674-75. Our currency bears the motto "In God We Trust." "Because of their history and ubiquity, those practices are not understood as conveying government approval of particular religious beliefs," id. at 693, but instead as part of the richness of the very fabric of our Judeo-Christian heritage which comprises an integral part of our Nation's history and culture./2

The proposed monument's reference to the Ten Commandments is much like other references (that have been deemed not to violate the Constitution) to God as set forth in the Christian history of our country--not an endorsement of religion, but merely an acknowledgment of the historical fact that the Ten Commandments served as an integral part of the foundation for our country's legal system. Because of the Ten Commandments' history and ubiquity, I believe that even if the monument would somehow fail the strictures of Lemon, Indiana's proposed monument as determined herein does not violate the Establishment Clause.

III.  Conclusion

The majority's decision, similar to that in Books, 235 F.3d 292, leads us further away from the mainstream--and to a point where irreligion is favored over religion. The Constitution does not require complete separation of church and state, but instead "it affirmatively mandates accommodation, not merely tolerance, and forbids hostility toward any," Lynch, 465 U.S. at 673, and the appropriate question to ask is whether an "objective" observer would believe that the display constitutes a government endorsement of religion, Santa Fe. Indep. Sch. Dist., 120 S.Ct. at 2278. After all, "[w]e are a religious people whose institutions presuppose a Supreme Being." Zorach, 343 U.S. at 313.

In my view, the proposed three-subject monument inscribed with the Ten Commandments, the Bill of Rights, and the Preamble to the Indiana Constitution, does not offend the Constitution. Instead, it serves as a well-deserved recognition of our country's legal, historical, and religious roots. Any possible endorsement of religion is diluted by the monument's placement on the Statehouse lawn with at least twelve other secular monuments memorializing and honoring the state's and nation's history.

Samuel Smith wrote My Country, 'Tis of Thee in 1831 and concluded his epic with the following lines:

Our fathers' God, to thee, Author of liberty, To thee we  sing;
Long may our land be bright, With freedom's holy light.
Protect us by thy might, Great God, our King!

Does Samuel Smith's song no longer represent the very values upon which this country was founded, and indeed, where government officials are forbidden to sing of the liberty about which Smith cherished above all else, simply because it refers to religion?

   I therefore respectfully Dissent from the court's holding that Indiana's proposed monument violates the Establishment Clause or constitutes an establishment of religion, and thus would REVERSE the district court's grant of the preliminary injunction.

FOOTNOTES

/1 While I obviously recognize the constitutional distinction between state and private action, I am surprised that the First Amendment has been used at times to protect pornography (and those who distribute and possess it) and private religious proselytization, while at the same time also been used to prohibit well-intentioned communities from expressing their understanding of our nation's history and culture and from making any reference to God. Indeed, people can receive pornography through the mail, over the internet, on their televisions because of the simple premise that one may turn it off. But wouldn't a person passing the proposed monument also be free to believe whatever he or she wants, to pass it by and thereby turn it off? In my opinion, the pornography available on the internet (often sent unsolicited) and religious proselytizers who come to people's homes seems far more invasive and difficult to "turn off" than a monument that sits passively among a beautiful grassy lawn adorned with monuments that honor the history of our nation and also the State of Indiana.

/2 Indeed, if one extends plaintiffs' theory of the case to its logical extreme, not only must every public monument be shorn of religious reference, but many of the nation's most revered documents must be cleansed as well. If the Ten Commandments are deemed constitutionally offensive, how can one justify the rich religious traditions of our nation established in government practices including the opening of a Congressional session or the opening of this court with a prayer; similarly, how can one justify the religious references as found in innumerable public documents, including the Declaration of Independence (which de-

clares God as the source of our rights) or the Constitutions to 46 out of the 50 states (which include references to "God," "Almighty God," and the "Supreme Ruler of the Universe," and with notable frequency refer to God as the author or source of human rights and liberties). A policy that tolerates religion does not improperly endorse it. See Chandler, 230 F.3d at 1317 (writing about the intersection of the Establishment Clause and Free Exercise Clause).